**GREATER LOUISVILLE AUTO AUCTION, INC., Appellant,**

v.

**OGLE BUICK, INC., et al., Appellees.**

Court of Appeals of Kentucky.

Feb. 12, 1965.

William P. Mulloy, Lee F. Swan, Louisville, for appellant.

Allen Schmitt, Louisville, Baker & Orbison, Bell & Bell, Indianapolis, Ind., Freeman Blackwell, Louisville, for appellees.

PALMORE, Judge.

The appellant, to which we shall refer as Auction or the auction company, is a corporation which during the time pertinent to this litigation conducted weekly auctions of used cars at its place of business in Louisville. On July 18, 1961, one Marion Caylor caused to be sold through the auction a group of automobiles he had purchased during the previous week from the various appellees, whom we shall call the Indiana sellers. Caylor had given the Indiana sellers checks on his bank at Franklin, Indiana, in full payment for cars so purchased. These checks, aggregating about $12,500, were rendered uncollectible by Auction's action on July 18 and 19, 1961, in stopping payment on checks it had theretofore given to Caylor as advances to finance his acquisition of vehicles to be sold through its auction, as well as the checks it gave Caylor on July 18, 1961, representing the proceeds from the cars auctioned off on that day, with the result that Auction kept the money for the cars Caylor had purchased from the Indiana sellers

and the Indiana sellers got nothing. So the Indiana sellers brought this action against Auction for the amounts of their checks from Caylor which had been made cold by Auction's stop payment orders.

The trial court found in favor of the Indiana sellers, and Auction appeals.

We do not have any question in this case concerning legal title of the vehicles in question, which passed freely from the Indiana sellers through Caylor to the ultimate purchasers. Cf. § 2–403, Uniform Commercial Code (KRS Ch. 355). The question to be decided is whether the Indiana sellers had, as between them and Caylor, any rights with respect to the property which under the particular circumstances were good against Auction's seizure of the proceeds. We agree with the chancellor that they did.

It was the custom over a period of some two years for Auction and Caylor on each Tuesday to exchange checks in the amount required in order for Caylor to purchase cars during the ensuing week. The purpose of Caylor's check to Auction was to cover the advance, and it would not be deposited by Auction until a week later. Auction received a fee of $20 per car sold through it by Caylor, and Caylor received whatever profit was realized on each car. Though Caylor was a vice president of the auction company, it can be assumed for purposes of the argument that in buying cars and selling them through Auction he was acting for himself, free of any control by the company. There was no restriction or understanding to the effect that the vehicles acquired with money advanced by Auction one week would be brought to the auction the very next week. Caylor had a wholesale car lot at Franklin, Indiana, and often brought newly acquired vehicles there to be "cleaned up" before taking them to Louisville for sale.

On the eve of Tuesday, July 18, 1961, Auction had two $15,000 checks it had received from Caylor on July 11 and had not yet deposited, one $20,000 check dated June 20 which had bounced three times, and two $15,000 checks dated June 27 which had bounced once.[1] The chief officer of Auction were greatly alarmed, and in spite of reassurances from Caylor that he had other checks coming in and also had some $10,000 worth of cars at his lot in Franklin, when their bank opened its doors on the morning of July 18 they stopped payment on about $21,000 in outstanding checks "and all others" they had given Caylor, and on the next day executed a similar order covering "all checks to Marion Caylor." These stop orders had the effect of cancelling about $36,000 worth of checks Caylor had deposited in his bank at Franklin, thus wiping out his bank account. Meanwhile, on July 18 the cars Caylor had bought from the Indiana sellers had been sold and Auction had issued Caylor checks in the amount of about $12,000 representing the proceeds.[2]

Both at common law and under the Uniform Sales Act the implied lien of an unpaid seller of personal property depended on possession and was lost by delivery to the buyer. 46 Am.Jur. 677–679 (Sales, § 520); § 56, Uniform Sales Act (formerly KRS 361.560); Hoven v. Leedham, 153 Minn. 95, 189 N.W. 601, 31 A.L.R. 574 (1922). The same rule applied in equity. 46 Am.Jur. 680 (Sales, § 521). Both the Uniform Sales Act (§ 73) and its successor, the Uniform Commercial Code[3] (§ 1–103), provide that unless displaced by the statutes the principles of common law and equity relative to fraud and other invalidating circumstances continue to apply. The rule in this state prior to the enactment of the Uniform Sales Act in 1928 was that if the buyer obtained possession of goods not intending to pay for them the seller had

---

1. No auction was held during the week in which Tuesday fell on July 4.

2. These checks later were handed back to Auction by Caylor, but of course the stop orders had rendered them worthless to Caylor anyway.

3. KRS Chapter 355, adopted in 1958, effective July 1, 1960.

a right of rescission, though not as against a third party bona fide purchaser for value and without notice. Nashville Grain & Feed Co. v. American Co-op Ass'n, 203 Ky. 458, 262 S.W. 634 (1924); Templeman v. Salisbury, 222 Ky. 53, 299 S.W. 1095 (1927). But even if it be assumed that this rule continues in existence under the UCC, it does not apply here because there is no finding that Caylor, at the time he took possession from the Indiana sellers, did not intend that they be paid. Therefore, unless the UCC has effected some modification in this respect the Indiana sellers, after delivering the automobiles to Caylor, had no rights or interest in them.

■ ■ UCC § 2–507(2) provides that when payment for goods is due and demanded on delivery, as between the parties the buyer's right to retain or dispose of the property is "conditional upon his making the payment due." Payment by check "is conditional and is defeated as between the parties by dishonor of the check on due presentment." UCC § 2–511(3). Therefore, as between Caylor and the Indiana sellers Caylor had no right either to retain or dispose of the cars. In such circumstances the UCC does not specifically reserve to the seller a right of reclamation. However, Comment 3 to UCC § 2–507 suggests that the seller's rights are the same as provided in UCC § 2–702, relating to sale on credit to an insolvent buyer, and we agree that surely the rights of an unpaid seller under UCC § 2–507(2) must be no less than in the case of a sale falling within the express terms of UCC § 2–702 (2).

■ According to UCC § 2–702(2), if the seller discovers that the buyer has received goods on credit while insolvent (however innocently) he may reclaim them on demand within 10 days after the receipt. § 2–702(3) makes this right of reclamation subject to the rights of a buyer in ordinary

course[4] or other good faith purchaser or lien creditor. "A person is 'insolvent' who either has ceased to pay his debts in the ordinary course of business or cannot pay his debts as they become due or is insolvent within the meaning of the federal bankruptcy law." Id., § 1–201(23). Under this definition it seems obvious that Caylor was "insolvent" when he traded with the Indiana sellers on July 14 and 15, 1961. Hence if the sales had been made "on credit" each of the sellers would have had a right of reclamation until the cars were resold within 10 days thereafter. We hold that an unpaid seller under UCC § 2–507 (2) has the same right. Cf. Comment 3, UCC § 2–507.

Certainly Auction was not a lien creditor, nor could it have been a "buyer in the ordinary course of business or other good faith purchaser" from Caylor, since it did not purchase from him but merely acted as his agent in selling the cars to others. By retaining the proceeds Auction in effect took the cars from Caylor, not as a buyer but as an unsecured creditor, and applied them toward the satisfaction of its account against him. Though technically the Indiana sellers' right of reclamation ended when the cars were sold at auction to the ultimate buyers in ordinary course, we think that equity cannot allow Auction to retain the proceeds under circumstances in which it would not have been permitted to defeat the prior and superior rights of the Indiana sellers by taking the cars themselves.

■ Our conclusion to the effect that the rights of the Indiana sellers survived the resale of the cars and attached to the proceeds is based on equitable principles. The chancellor found as a fact, and his finding is supported by substantial evidence, that when the cars were sold on July 18 Caylor had not been advised and did not know his checks from Auction had been stopped.

---

4. A buyer in ordinary course is one who takes in good faith and without "knowledge" of the interest of a third person. UCC § 1–201(9). "Knowledge," as distinguished from "notice," means *actual* knowledge. Id., § 1–201(25).

Indeed, Mr. Isaacs, president of the company, admitted that the reason he did not tell him was because he (Isaacs) did not want him to stop the sale of the automobiles; "we was going to try to collect all we could." Isaacs admitted also that even before the checks covering the cars sold on July 18 were issued he expected to get them back. All of this adds up to a conscious design on the part of Auction to decoy Caylor into going through with the sale and then to withhold the proceeds. By virtue of Caylor's ignorance of that design, for all practical purposes Auction had already converted the automobiles to its own account before the sale. From an equitable standpoint we think the act of Auction in retaining the money should relate back to the time its purpose to do so was conceived and the property was put in its hands for sale. At that time the right of reclamation by the Indiana sellers existed intact, because Caylor had not transferred title to the cars.

■ All that we have said still might not justify impressing the interest of the Indiana sellers upon the proceeds of sale except that Auction knew enough of the circumstances to put it on notice of the likelihood that its actions in stopping payment of its checks would result in the dishonor of checks Caylor had issued in payment for the vehicles sold. The chancellor so found, and in our opinion that factual conclusion is supported by the evidence.

■ We recognize that the Indiana sellers, who had done business with Caylor on prior occasions, looked solely to his credit for their pay. Each of them took his personal check in satisfaction of the bargain and sale. Since he thought his checks would be good, he did not commit actual fraud on them. Auction had no detailed knowledge of the transactions between Caylor and the sellers. So far as it was concerned the cars belonged to Caylor and he had the unencumbered title papers. Ostensibly he could have paid cash for them, though there is nothing in the record to suggest any such custom on his part. Caylor also did an undisclosed amount of borrowing from another source. Nevertheless, Auction knew that for the past two or three weeks Caylor's checks had been bouncing like rubber balls, from which it was bound to realize that other checks given by him to other people would likewise be dishonored, particularly after the stop orders. One would ordinarily expect business of the type here in question to be done by check. Auction surely realized from the ordinary course of its business with Caylor that these automobiles probably had been purchased very recently.[5] That they had been paid for by check also was an undeniable likelihood; that such checks would be dishonored was almost a certainty. Therefore, we agree with the chancellor that Auction's knowledge of the circumstances was sufficient to put it on notice of the rights of the Indiana sellers. "A person has 'notice' of a fact when * * * from all the facts and circumstances known to him at the time in question he has reason to know that it exists." UCC § 1–201(25).

The judgment is affirmed.

5. In fact, such information must have appeared on the face of the title papers turned in to Auction's office by Caylor.