Argued June 10, reversed and remanded August 23, 1968

STUMBO ET AL, *Respondents, v.* PAUL B. HULT
LUMBER CO. ET AL, *Defendants,*
RICH, *Respondent and Cross-Appellant,*
J. H. BAXTER & CO. ET AL,
*Respondents,*
SOUTHERN LOGGING COMPANY,
*Appellant.*

SOUTHERN LOGGING COMPANY,
*Appellant, v.* KEYSTONE LUM-
BER COMPANY, *Defendant,*
WOODRUFF, *Garnishee.*
444 P. 2d 564

*Darryl E. Johnson,* Roseburg, argued the cause and filed briefs for respondent and cross-appellant Arthur I. Rich.

Stultz, Jayne, Murphy & Anderson, Roseburg, filed a brief for appellant Southern Logging Company.

*Donald H. Coulter,* Grants Pass, argued the cause and filed a brief for respondents Robert G. Stumbo and Allan D. Stumbo, co-partners, dba Stumbo Brothers Logging Co., and Vernon Strong, Richard Tyke, John L. Casteel and Clyde Marriott. With him on the brief were Long, Neuner, Dole & Caley, Grants Pass, for respondent J. H. Baxter & Co., and Johnson, Telfer & Sloan, Grants Pass, for respondents Kenneth Brady, Donald Brady and Pierre Biencourt.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and HOLMAN, Justices.

## O'CONNELL, J.

This is a suit for a declaratory decree establishing the rights of various creditors of defendant Keystone Lumber Company. Plaintiffs Allan and Robert Stumbo brought an action asserting their claim as creditors of Keystone and in a separate action Southern Logging Company asserted its claim as a creditor of Keystone. The two actions were consolidated for trial. In the consolidated action Southern Logging Company became in effect a defendant as to plaintiffs Allan and Robert Stumbo and, therefore, for the purpose of convenience, we shall treat the Stumbos as the only plaintiffs in the case on appeal.

The trial court held that the claim of plaintiffs Allan and Robert Stumbo had priority over the claim of Arthur I. Rich, the holder of a security interest in the inventory of Keystone and also over the claim of Southern Logging Company, an attaching creditor. Rich and Southern Logging Company appeal. The facts are as follows.

Riddle Manufacturing Co. was formed as an Ore-

gon corporation in September, 1949; its stockholders and officers were Herbert Paetz, Rudolph Paetz, and Clyde Cockerell; its plant was at Riddle, Oregon where it did a general lumber remanufacturing business. Economic climate for the lumber industry was good, and by the early 1950's Riddle's production was from two to two and a half million board feet per month. Riddle had banking connections with Douglas County State Bank which was later absorbed into the chain of First National Bank of Oregon. In 1953 the proprietors of Riddle acquired a sawmill at Canyonville, Oregon. It was separately incorporated as an Oregon corporation under the name of Keystone Lumber Company, but the two corporations had the same management and were operated together, Mr. Herbert Paetz being general manager of both. The evidence shows that there was a constant commingling of the finances, conduct of business, and the business affairs of the two corporations, and they were in fact operated as a single, integrated operation. Logs were brought to Keystone and sawed into rough lumber. The rough lumber was transported to Riddle and there processed into finished lumber, after which it was sold by Riddle. Until 1962 the receipts from such sales were deposited in Riddle's bank account and, after deducting a set cost for manufacturing the lumber, Riddle remitted the balance to Keystone. By accounting practice, the debts of the combined operation were substantially amassed in Keystone.

When Keystone was formed in 1953 it was capitalized at $1,000. Thereafter, additions to capital were made through stockholder loans, either directly or by others with the loans guaranteed by the stockholders. The three stockholders of Riddle owned 55% of Keystone stock and the other holders in Keystone were

Francis Marsh, Eugene Marsh, W. H. Dashney and Dr. John Manning, all of McMinnville, who owned the remaining 45% of Keystone stock in different percentages. Stockholders' loans were advanced by them from time to time in the same proportions as their stock ownership. These loans began from the very inception of Keystone and continued thereafter. These parties were not only lending stockholders, they were also guarantors of loans to Keystone from the bank. They were not stockholders at any time in Riddle.

Keystone and Riddle apparently enjoyed reasonable financial success until 1961 when first Keystone and then Riddle was shut down for lack of cash and timber. At that time Keystone was indebted to Douglas County State Bank in an amount in excess of $130,000, of which $16,000 was secured by guaranty of the McMinnville group and the remainder by mortgages on physical plant and fixed assets.

In 1962 M D M Company, a joint venture, was formed by the McMinnville parties to finance the recommencement of operations by Keystone and Riddle. The joint venture agreement dated March 26, 1962, stipulated that no participant in the venture had authority to bind the other participants without the assent of all. It also operated as an agreement between M D M and Riddle and Keystone by which M D M agreed to loan the two corporations up to $50,000, such loans to be secured by the log inventories of Keystone, title to which was to be transferred log by log to M D M as logs were purchased by Keystone, and the accounts receivables of Riddle, which were to be assigned to M D M as they accumulated. In execution of the agreement an account in favor of M D M was established in the bank and the proceeds of all sales of lumber by Riddle were deposited in this ac-

count. M D M authorized an employee of the bank to disburse the funds thus deposited to Keystone and Riddle to meet their operating expenses and some fixed liabilities.

Pursuant to the above arrangement, in April, 1962 M D M loaned $35,000 to Keystone to obtain logs from Georgia-Pacific Company. The agreement of March 26, 1962 was twice amended in 1962 and the maximum amount to be loaned was raised to $125,000. Between April, 1962 and March 24, 1964, M D M allegedly loaned to Keystone, by deposit in the M D M account available for use by Keystone and Riddle, the remaining $90,000 provided for in the amended agreement.

On March 24, 1964 the 1962 loan agreement was replaced by a security agreement covering all inventory of Keystone, including after-acquired inventories. The alleged purpose of this agreement was to bring the arrangement into conformity with the Uniform Commercial Code effective in Oregon on September 1, 1963. A statement of indebtedness of $125,000 in the 1964 security agreement is the primary evidence of the amount of the debt claimed to be owed to M D M. The security interest evidenced by the 1964 security agreement was perfected by the filing of financial statements containing a description of inventories claimed by M D M as security and including the proceeds of such inventories. The statements were filed in the Secretary of State's office and the office of the County Clerk of Douglas County as required by ORS 79.4010.

In October of 1964 the McMinnville parties, except for Manning, withdrew as shareholders of Keystone. At that time the McMinnville parties cancelled the debt of approximately $75,000 to $80,000 incurred by Keystone in the years before 1962. These parties,

however, were added to the board of directors of Keystone. Although Keystone showed a profit of some $50,000 in the fiscal year ending on June 30, 1964, it suffered severe flood damage in the latter half of 1964 and was forced to secure a loan from the Small Business Administration. In securing this loan it was necessary for M D M to permit a cessation of payments on its loan until the SBA was paid.

In October of 1965 Keystone, finding itself unable to pay for rapidly accumulating log inventories, secured a substantial loan from the bank by agreeing to fieldwarehouse over a million board feet of logs which were physically segregated and decked alongside and in Keystone's millpond. In making the loan the bank demanded and received from M D M a subordination of M D M's security interest to the extent of the warehoused logs.

Beginning about July, 1965, Southern Logging Company delivered substantial quantities of logs to Keystone. Despite the additional financing from the bank, Keystone was unable to pay Southern Logging for logs delivered in the latter half of October, 1965. Keystone requested and Southern Logging agreed to accept three post-dated checks in payment for such October deliveries. The post-dated checks were never honored. Southern Logging delivered only $810.69 worth of logs to Keystone in November of 1965.

Plaintiffs Robert G. Stumbo and Allan D. Stumbo, co-partners in the general business of logging, began selling logs to Keystone about August 1, 1965 and continued such sales until about November 19, 1965. During the period from November 1, 1965 to November 19, 1965, the plaintiffs, pursuant to oral agreement, delivered to Keystone logs totalling 134,270 board feet

for which plaintiffs were entitled to be paid the sum of $7,643.21.

During the same approximate period of time, other loggers, including defendants J. H. Baxter & Co., Pierre Biencourt, Kenneth Brady, Donald Brady, Vernon Strong, Richard Tyke,[①] Casteel & Gilliam, and John L. Casteel, also delivered logs to Keystone in quantities approximating 24,290; 64,460; 34,980; 41,900; 7,740; 78,170; 14,270; and 12,640 board feet, respectively.

All the logs delivered by these parties, including Southern Logging and plaintiffs, were dumped into Keystone's millpond and commingled. Some of the logs were branded, others were not.

While there was testimony that they had a right to do so, none of the loggers demanded payment for their logs when delivered. According to the custom and usage of the lumber industry in Oregon, independent loggers selling their logs on the open market to sawmills were to be paid on the twenty-fifth of each month for logs delivered between the first and fifteenth days of that month, and on the tenth day of each month for logs delivered between the sixteenth and last days of the preceding month. The loggers were not paid according to such trade custom and remained unpaid at the time the action below was instituted.

On November 21, 1965 Keystone's sawmill was totally destroyed by fire. Insurance proceeds of $100,000 went to the bank in satisfaction of mortgages held by the bank. Encumbrances on the residual physical assets exceeded the worth of these assets on liquidation. The warehoused logs were sold and the

---

[①] The claim of Richard Tyke was assigned to Clyde Marriott who is now the owner and holder thereof.

proceeds from the sale paid in full the loan thus secured. There was some suggestion in the testimony that the proceeds of the sale of the warehoused logs exceeded the amount of the loan owed to the bank. The proceeds of lumber inventories were consumed in application to outstanding invoice loans.

The only assets not disposed of in satisfaction of outstanding claims and thus available to pay the unpaid loggers were the logs in Keystone's millpond at the time of the fire. On November 22, 1965, Keystone requested authorization from M D M and the bank to sell these logs and pay the loggers. Keystone, believing it had received such authorization, orally arranged with defendant Paul B. Hult Lumber Company to have Hult purchase the logs. The loggers, including Southern Logging, were then assured by representatives of Keystone and Hult that they would be paid. However, M D M delayed approval of the sale to Hult and finally on about December 5, 1965, M D M informed Keystone it would not go through with the sale.

Plaintiffs, who became apprehensive when the sale to Hult did not promptly take place, organized several of the other loggers, excepting Southern Logging, and on December 13, 1965, plaintiffs and these other loggers removed from Keystone's millpond some 345,780 board feet of logs, without regard to indications, brand or otherwise, that the logs removed were those delivered by the loggers engaging in the removal. Keystone, under advice from M D M's attorney, made no effort to resist the removal.

The logs thus taken from Keystone's millpond were then hauled to Hult, who agreed to purchase them. Hult processed the logs but because there were conflicting claims to the proceeds Hult remitted the pro-

ceeds amounting to $19,851.49 to Warren A. Woodruff to be held for the benefit of whoever should be found to be lawfully entitled thereto. Hult and Woodruff disclaim any interest in these proceeds.

Southern Logging, which had not joined with plaintiffs in removing and selling the logs to Hult, pursued its own course of action by filing a suit based on the post-dated checks. On December 24, 1965, Southern Logging took a default judgment against Keystone in the amount of $23,413.04. Southern Logging then procured execution on this judgment and sought to garnish the fund held by Woodruff. Woodruff denied that it had any property belonging to Keystone.

Southern Logging then brought suit in the Douglas county circuit court against Hult and Woodruff, alleging that the logs delivered by plaintiffs and the other loggers to Hult were at all times the property of Keystone and that consequently the fund held by Woodruff also was Keystone's property. Plaintiffs in turn brought suit against Keystone, Hult, M D M and the other loggers in the Josephine county circuit court asserting that the logs were rightfully retaken from Keystone and sold to Hult and that the fund should be applied in satisfaction of their claim against Keystone. Arthur I. Rich, who took an assignment of M D M's interest seven days before trial, denied plaintiffs' claim and asserted a right to the fund based on the security agreements entered into between Keystone, Riddle and M D M. By stipulation these actions were consolidated for trial.

The trial court first held that the security interest created by M D M and relied on by Arthur I. Rich was unenforceable and therefore afforded no basis of relief. The court then found that the logs retaken by plaintiffs and the other loggers were delivered pur-

suant to a "cash sale" and were rightfully retaken and resold when Keystone failed to pay. On the basis of this finding, the court held that the fund held by Woodruff was not property of Keystone subject to garnishment by Southern Logging. It further held that by pursuing an independent course of action, Southern Logging had waived any claim it might have had to the fund based on delivery of logs to Keystone pursuant to a "cash sale." Judgment was entered for plaintiffs and the other loggers. Southern Logging and Arthur I. Rich appeal from that decision.

██ The decree of the trial court must be reversed. It is our conclusion that M D M acquired a security interest in the log inventory of Keystone and that this interest had priority over the claims of plaintiffs and Southern Logging Company.

M D M took the necessary steps under the Commercial Code to acquire and perfect an enforceable security interest in the logs which were subsequently removed from the Keystone millpond by plaintiffs. M D M's interest in the log inventory was initially created by the security agreement of March 26, 1962. So viewed, M D M's security interest would be founded upon an obligatory agreement to make future advances covering after-acquired property. The extent to which a security in this form would be valid prior to the adoption of the Commercial Code is subject to some doubt.[2] However, the security agreement of March 21, 1964 was intended to bring the arrangement into conformity with the Commercial Code. Since the Code

---

[2] Under our pre-Code cases mortgages on fluctuating inventories were occasionally held invalid. Dudley v. Eberly, 201 F Supp 728 (D Or 1962) and cases cited therein. See Tooze, The Oregon Law Relating to Chattel Mortgages upon Fluctuating Stocks of Merchandise, 5 Or L Rev 249 (1926).

recognizes security interests in inventory,[8] any defect in the 1962 arrangement was cured by the 1964 security agreement.[9]

■ Even if we assume that the original agreement was invalid and was not validated by the 1964 security agreement, M D M would have acquired an enforceable security interest by virtue of the 1964 agreement itself. The fact that in such a case the security interest would have been given for an antecedent debt resulting from loans previously made by M D M to Keystone would not render the security interest ineffective under the Code.[10]

■ There is no contention that any security interest M D M had was not properly perfected under the Code.[11] Thus, whether we consider M D M's security interest to derive from the 1962 agreement, as affected by the 1964 agreement, or the 1964 agreement itself,

---

[8] ORS 79.2040 (1), (3) and official comments 2 and 3 to the section; Evans Products Co. v. Jorgensen, 245 Or 362, 421 P2d 978 (1966). See also, Gilmore, Security Interests in Personal Property, Ch. 11 (1965).

[9] In effect, the parties chose to have their arrangement governed by the Commercial Code rather than pre-Code law. There is no reason why they should not be permitted to do so. Cf., Scott v. Stocker, 380 F2d 123 (10th Cir 1967); Janover and Dulles, The Application of the Transition Provisions of Uniform Commercial Code Article 10 to Chattel Security Filing, 39 N Y U L Rev 1027, 1030-31, n. 11 (1964). A different problem is presented where the rights of third parties have intervened. We need not deal with that problem here.

[10] The Code expressly recognizes that "value" is given when rights are acquired as security for a pre-existing claim. ORS 71.2010 (44); Gilmore, supra at 352.
If the security interest is deemed to have been created in 1962 and merely brought into conformity with the Code in 1964, there would be no problem resulting from the after-acquired property aspect of the arrangement since under ORS 79.1080 if the debtor acquires rights in after-acquired property in the ordinary course of his business, the security interest is deemed to be taken for new value and not as security for an antecedent debt.

[11] See ORS 79.3020 and ORS 79.4010.

M D M had an enforceable perfected security interest. For reasons which will appear this security interest gave M D M priority over both plaintiffs and Southern Logging.

The Code provides that a seller of goods may, under certain circumstances, recover goods delivered to the buyer. Thus ORS 72.7020 (2) permits a reclamation of goods from a buyer who received the goods while insolvent. However, reclamation under this section is conditioned upon a demand made within ten days after the receipt of the goods by the buyer.[7] No such demand was made in the present case.

. A seller also may have the right to recover goods from a buyer under ORS 72.5070 (2),[8] which provides as follows:

"(2) Where payment is due and demanded on the delivery to the buyer of goods or documents of title, his right as against the seller to retain or dispose of them is conditional upon his making the payment due."

However, plaintiffs acquired no interest in the logs under the foregoing section for the reason that pay-

---

[7] ORS 72.7020 (2) provides:

"(2) Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within 10 days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within three months before delivery the 10-day limitation does not apply. Except as provided in this subsection the seller may not base a right to reclaim goods on the buyer's fraudulent or innocent misrepresentation of solvency or of intent to pay."

[8] See Greater Louisville Auto Auction v. Ogle Buick, Inc., 387 SW2d 17 (Ky 1965). Cf., Evans Products Co. v. Jorgensen, *supra;* Peters, Remedies for Breach of Contracts Relating to the Sale of Goods Under the Uniform Commercial Code: A Roadmap for Article Two, 73 Yale L J 199, 221 (1963); Comments to ORS 72.5070.

ment was neither "due" nor "demanded" on the delivery of the logs.

As we previously noted, the trial court seemed to attach significance to the fact that plaintiffs dealt with Keystone on a "cash basis." If by this the court intended to bring the transaction within the so-called "cash sale" doctrine, as a remedy distinct from those provided for in either ORS 72.7020 (2) or ORS 72.5070 (2), then the trial court was in error.⁹ ORS 72.5070 (2) represents whatever remains of the "cash sale" doctrine under the Code. *Evans Products Co. v. Jorgensen*, 245 Or 362, 365-66, 421 P2d 978 (1966).¹⁰

Plaintiffs contend that their removal of the logs constituted a reclamation of goods under ORS 72.7050 (1). That section provides as follows:

"(1) The seller may stop delivery of goods in

---

⁹ According to the "cash sale" doctrine a seller had a right to recover goods, even as against an innocent subpurchaser. See, *e.g.*, Weyerhaeuser Co. v. First Nat. Bank, 150 Or 172, 38 P2d 48, 43 P2d 1078 (1935).

¹⁰ We do not wish to intimate that plaintiffs would have priority if they had satisfied the requirements of ORS 72.7020 (2) or ORS 72.5070 (2). The contrary is probably true. Subsection (3) of ORS 72.7020 provides that "the seller's right to reclaim under subsection (2) * * * is subject to the rights of a buyer in ordinary course or other good faith purchaser or lien creditor under ORS 72.4030." Under ORS 72.4030 (1) a purchaser of goods has the power to transfer to "a good faith purchaser for value." Similarly, any rights a seller may have against the buyer under ORS 72.5070 (2) are subject to the rights of third parties. See Comment 3 to ORS 72.5070; ORS 72.4030 (1) (e); Peters, *supra* at 221, n. 70. It is to be noted that a secured party can fit into the definitions elsewhere in the Code so as to satisfy the requirement of a "purchaser" (ORS 71.2010 (32) (33)) in "good faith" (ORS 71.2010 (19), ORS 72.1030 (1) (b)) and "for value" (ORS 71.2010 (44)). It would seem that the result would not be affected by the fact that the goods sought to be reclaimed are after-acquired inventory with respect to the secured party's claim since the Code recognizes that "a person gives value for rights if he acquires them as security for or in total or partial satisfaction of preexisting claim." ORS 71.2010 (44) (b). See In re Hayward Woolen Co., 3 U.C.C. Rep 1107 (1967).

the possession of a carrier or other bailee when he discovers the buyer to be insolvent as provided in ORS 72.7020 and may stop delivery of carload, truckload, planeload or large shipments of express or freight when the buyer repudiates or fails to make a payment due before delivery or if for any other reason the seller has a right to withhold or reclaim the goods."

This section is applicable only when goods are in the process of delivery and before the buyer has acquired possession. It cannot be understood as providing an independent right of recovery of goods in the possession of a buyer. The language "or if for any other reason the seller has a right to withhold or reclaim goods" clearly is intended to indicate only that a seller may stop the delivery of goods in transit or in the possession of a bailee where the conditions of withholding or recovering goods from the buyer himself are otherwise satisfied. In the present case all of the logs had been delivered to Keystone's millpond before plaintiffs attempted to reclaim them.

We find no other section of the Code under which plaintiffs could assert that they had a right to recover the logs from Keystone.[11]

---

[11] Plaintiffs suggest that they had a "security interest" in the logs which was good against M D M and Southern Logging notwithstanding the lack of an agreement providing for the creation of such a security interest and the fact that none of the formalities of the article dealing with secured transactions (ORS 79.1010 et seq.) was complied with. While it is true that security interests may arise solely under the sales article (ORS 72.1010 et seq.) and that such security interests may be enforceable apart from the formalities of the secured transactions article, this is true only so long as the buyer does not obtain possession of the goods. See ORS 79.1130. To hold otherwise, as plaintiffs would have us do, would be to upset the entire scheme of the Code which is to deny the recognition of "secret liens" where the device for creating and protecting a non-possessory interest

Consequently, we conclude that plaintiffs had no right to recover the logs from Keystone and were no more than unsecured general creditors without any interest in particular assets of Keystone, including the logs taken from Keystone's millpond. See generally, Peters, Remedies for Breach of Contracts Relating to the Sale of Goods Under the Uniform Commercial Code: A Roadmap for Article Two, 73 Yale L J 199 (1963). The security interest of M D M was clearly superior to the claim of such a creditor. ORS 79.2010; *Evans Products Co. v. Jorgensen, supra.*

Southern Logging Company, by virtue of its judgment and garnishment became a "lien creditor" within the meaning of ORS 79.3010 (3). However, the claim of a lien creditor is subordinate to a previously perfected security interest.[12] Since M D M acquired and perfected a security interest antedating Southern Logging Company's lien, Rich as assignee of M D M has priority over the lien claimant. Both plaintiffs and Southern Logging could have protected themselves by creating and perfecting a purchase money security interest in the logs sold to Keystone (ORS 79.1070) and giving proper notice to M D M under ORS 79.3120 (3).[13]

---

in goods is readily available (in this case in the form of a purchase money security interest. See ORS 79.1070). For the same reason, plaintiffs could not have a security interest arising totally outside the Code. See Gilmore, *supra* at 335-36, 345.

[12] ORS 79.2010; ORS 79.3010 (1) (b). See Gilmore, *supra* at 435-37.

[13] ORS 79.3120 (3) provides:

"(3) A purchase money security interest in inventory collateral has priority over a conflicting security interest in the same collateral if:

"(a) The purchase money security interest is perfected at the time the debtor receives possession of the collateral; and

38

 The trial court held, and plaintiffs urge on appeal, that M D M's security interest was subordinate to plaintiffs' interest on the ground that "the security interest of the M D M Company was to secure an antecedent indebtedness, the security interest being taken at a time when Keystone Lumber Company was insolvent and when M D M Company knew that such corporation was insolvent." The principle relied upon is stated and applied in *Gantenbein v. Bowles et al,* 103 Or 277, 289-90, 203 P 614 (1922). There the court said:

> "* * * [W]here a corporation is insolvent or has reached such condition that its directors or officers see that they must deal with its assets in the view of its probable suspension, they cannot use those assets to prefer themselves as creditors or sureties in respect to past advances to the prejudice of general creditors."

If M D M's security interest is deemed to have been effectively created under the 1962 security agreement then, of course, the foregoing principle would not be applicable because the 1962 agreement was not taken to secure an antecedent debt; it was to provide security for future advances. This distinction is

---

"(b) Any secured party whose security interest is known to the holder of the purchase money security interest or who, prior to the date of the filing made by the holder of the purchase money security interest, had filed a financing statement covering the same items or type of inventory, has received notification of the purchase money security interest before the debtor receives possession of the collateral covered by the purchase money security interest; and

"(c) Such notification states that the person giving the notice has or expects to acquire a purchase money security interest in inventory of the debtor, describing such inventory by item or type."

clearly expressed in *Gantenbein v. Bowles, supra,* quoting from *Illinois Steel Co. v. O'Donnell,* 156 Ill 624, 634, 41 NE 185, 31 LRA 265:

> " 'There is a marked difference between a case where a mortgage or other preference is given by an insolvent corporation to a director or officer to secure a pre-existing indebtedness, and a case like this, where the corporation, though in fact insolvent, in the sense above stated, is a going corporation that is seeking to accomplish the objects of its incorporation, and the security is given to directors for moneys actually and in good faith loaned, at the time the security is given, to such embarrassed corporation, and for its benefit.' " 103 Or at 293.

Even if we assume that M D M's security interest was first created by the 1964 agreement, the principle stated in *Gantenbein* would not be applicable. That principle is applicable only "where the corporation is insolvent or has reached such condition that its directors or officers see that they must deal with its assets in the view of its probable suspension." (103 Or at 289). In March of 1964 Keystone was not insolvent nor was the "probable suspension" of the company in view. The balance sheet for the fiscal year ending on June 30, 1964 shows that Keystone made a profit of $55,000 for that period. Herbert Paetz, manager of Keystone, although admitting that in 1962 he would have considered the company insolvent, testified that conditions later changed for the better. He testified:

> "Q Did that condition [i.e., as of 1962] change at any point?
>
> "A We again supported 120 families for an additional four and a half years, and I have no doubt would still be doing so if the flood and fire had not completely ruined us.
>
> "Q On or about October 1, 1965, what would be

your appraisal? Would still any reasonable person have considered it insolvent?

"A No. In October 1st, 1965, I think we would have continued and got in fine shape.

"Q But you were having difficulty in paying your bills in the course of events?

"A Only by reason of stacking up a large inventory. Prior to that time I had had no problem for quite some time, except the general problems of keeping the coffers in rotation."

Thus in summary we observe that the principle announced in *Gantenbein* does not apply whether we assume that the 1962 agreement is controlling, in which case the security would not be given for an antecedent debt, or that the 1964 agreement is controlling, in which case the element of insolvency would be lacking.

■ As an additional ground for giving plaintiffs priority over the claim of Rich, assignee of M D M, the trial court held that M D M was estopped to assert its interest against plaintiffs. The estoppel is predicated upon M D M's conduct following the destruction of the Keystone mill on November 1, 1965. The day after the fire Paetz, manager of Keystone, called Mr. Frank Marsh of M D M and requested that permission be granted by M D M to sell the logs on hand for the purpose of paying first the payroll and then the loggers including plaintiffs and also other outstanding accounts. M D M consented to this plan. Paetz then assured plaintiffs and the other loggers that the logs would be sold and their claims would be paid. However, there is no evidence that M D M assured plaintiffs or others that they would be paid, nor did M D M authorize Paetz to give such an assurance. We do not think that M D M's consent to the proposed plan submitted by Paetz, which simply called for the payment

of various obligations of Keystone, can be regarded as a representation to plaintiffs which they could regard as the grant to them of a priority over M D M's claim.

Moreover, there is no showing that plaintiffs changed their position to their detriment in reliance upon the proposed plan of payment. It is argued that there were surplus assets at the time the assurances were given and that by relying on these assurances plaintiffs did not pursue the remedies they would have with respect to the surplus assets. There was no evidence, however, to show that there were assets over and above the amount necessary to satisfy M D M's claim. We find no estoppel.

Plaintiffs present an argument against the enforceability of the M D M security interest based upon ORS 79.1080. That section provides:

> "Where a secured party makes an advance, incurs an obligation, releases a perfected security interest, or otherwise gives new value which is to be secured in whole or in part by after-acquired property his security interest in the after-acquired collateral shall be deemed to be taken for new value and not as security for an antecedent debt if the debtor acquires his rights in such collateral either in the ordinary course of his business or under a contract of purchase made pursuant to the security agreement within a reasonable time after new value is given."

The official text to the section explains that "ORS 79.1080 makes explicit what has been true under the case law: an after-acquired property interest is not, by virtue of that fact alone, security for a preexisting claim." The comment goes on to explain that "This rule is of importance principally in insolvency pro-

ceedings under the Federal Bankruptcy Act or state statutes which make certain transfers for antecedent debt voidable as preferences."[10]

The thrust of plaintiffs' argument is contained in the following excerpt from their brief:

"* * * [T]he 'floating lien' of UCC, previously created for an original debt, is, by the statute, deemed to be made on after acquired property, for the 'new value and not as security for the antecedent debt.' In most cases, this would have the effect of protecting the 'floating lien' against assertion it was attached to secure an antecedent debt, and therefore a voidable lien. But to gain this protection, something had to be sacrificed; this was, that the after acquired property is not made subject to the floating lien for the antecedent debt, but only for the new value; and to this extent, this section is a limitation on the scope of the 'floating lien.'

"So here, the debt and obligation which cross-appellant is seeking to have enforced on the after acquired logs, is one which antedated October 1, 1965, when M D M Co. released a perfected security interest on an item of goods theretofore embraced within its 'floating lien,' and these logs cannot be applied for that purpose."

We have difficulty capturing the thought which plaintiffs are attempting to advance in this argument. The assertion that "the after acquired property is not made subject to the floating lien for the antecedent debt, but only for the new value" is not supported by the language of ORS 79.1080. The section does not purport to describe the circumstances under which

---

[10] See In re Portland Newspaper Publishing Co., 271 F Supp 395 (D Or 1967); Rosenberg v. Rudnick, 262 F Supp 635 (D Mass 1967); Gilmore, *supra*, § 45.6; Coogan Article 9 of the Uniform Commercial Code: Priorities Among Secured Creditors and the "Floating Lien," 72 Harv L Rev 838, 854 (1959).

property is subject to a "floating lien." It describes only the circumstances under which after-acquired property subject to a "floating lien" is or is not deemed to be security for an antecedent debt. That question is not relevant for purposes of this appeal.[19]

To the extent that plaintiffs attempt to give ORS 79.1080 a different meaning by focusing only on that part of the statute dealing with the case where a secured party "releases a perfected security interest," our short answer is that the argument has no application to the present case because M D M did not release its security interest within the meaning of the statute. The release contemplated by the statute is a release of a perfected security interest *to the debtor*. A subordination agreement, if it can be regarded as a release at all, operates only to release an interest to a third person and is not in any sense a release to the debtor. The statute treats the release of the security interest as a form of giving "new value." M D M gave "new value" to Keystone when it entered into the loan agreement,[20] or at least when it actually made the loans. Certainly it cannot be argued that M D M gave "new value" to Keystone when M D M subordinated its claim to that of the bank.

But whatever meaning is given to the provision of the statute relating to the release of security interest, it seems obvious that the provision was not intended to operate so as to vitiate a security interest intended by its holder to be preserved simply because it was modified for some purpose consistent with its preservation. We, therefore, reject plaintiffs' argument employing ORS 79.1080.

Plaintiffs made mention of the fact that Key-

[19] See Note 5, supra.
[20] ORS 71.2010 (44) (a); Gilmore, *supra* at 937.

stone was originally capitalized in 1953 at only $1,000. Although plaintiffs' brief does not develop the point, apparently the reference to the nominal capitalization of Keystone is intended to suggest that the members of M D M took advantage of their position as stockholders in making loans to Keystone when it was undercapitalized. There are circumstances in which stockholders' loans are subordinated to the claims of other creditors.[37] However, we do not find the necessary circumstances present in this case, especially since there was no evidence in the present case to prove that Keystone was undercapitalized[38] at the time of the loans made pursuant to the 1962 agreement or that plaintiffs were misled in any way by the financing arrangement between Keystone and M D M.

We have carefully examined the other arguments advanced by plaintiffs and we find them without merit.

Since we hold that Rich as assignee is entitled to prevail over the other parties and since there will be no assets remaining after satisfying Rich's claim, it is not necessary to decide the priority between Southern Logging Company and plaintiffs.

The decree of the trial court is reversed and the cause is remanded to enter an appropriate decree consistent with this opinion.

---

[37] See Taylor v. Standard Gas Co., 306 US 307, 59 S Ct 543, 83 L Ed 669 (1939); Gannett Co. v. Larry, 221 F2d 269 (2d Cir 1935); Ballantine on Corporations, § 129, p. 302, n. 52 (1946).

[38] See Arnold v. Phillips, 117 F2d 497 (5th Cir 1941), cert. denied 313 US 583 (1941); Note, 23 Md L Rev 260 (1963).