KENNEDY, Circuit Judge:
Coast Trading Co., a grain broker, ordered several carloads of grain from Collingwood Grain, Inc. to be shipped directly to stockyard clients of Coast. Collingwood shipped the grain but Coast’s drafts were dishonored and Coast filed for bankruptcy. Faced with competing demands from Coast and Collingwood, the stockyards deposited the money owed for the grain with the bankruptcy court. The bankruptcy court awarded Coast the amounts due on six of the eight carloads involved. The district court adopted the bankruptcy court’s findings as its own and affirmed. We conclude that Collingwood is entitled to the value of one of the six carloads of grain, and that the bankruptcy and district courts properly awarded the remainder of the cars to Coast.
I.
In February 1982, Coast contracted with three stockyards located in and around Phoenix, Arizona, to supply them with grain. To fulfill its obligations, Coast entered into two contracts to purchase a total of eight carloads of grain from Collingwood (contract numbers 1310 and 1397). Delivery was to be F.O.B. the stockyards. The eight carloads were shipped and delivered — “spotted” or shunted onto the railroad siding at the designated stockyard— as follows:
Car Date Number Shipped
SSW74142 4/01/82
SSW77325 4/01/82
SSW78633 4/01/82
SSW77554 4/01/82
SSW78849 4/01/82
SSW77487 4/02/82
SSW77602 4/02/82
SSW77563 4/07/82
Date Contract Delivered Number
4/05/82 1310
4/05/82 1310
4/05/82 1310
4/06/82 1310
4/06/82 1310
4/08/82 1397
4/15/82 1397
4/08/82 1397
The drafts Coast had given Collingwood in payment for the grain were dishonored *689 upon presentation commencing April 5, 1982.
On April 7, 1982, Coast filed a petition in bankruptcy. The next day Collingwood telephoned the stockyards to inform them that it was reclaiming the grain pursuant to Uniform Commercial Code (U.C.C.) section 2-702 and thereafter sent written demands for reclamation to Coast and the stockyards. Collingwood also stopped car 77602 in transit, allowing it to proceed only after the stockyard agreed to purchase the grain directly from Collingwood. Several days later, April 13, 1982, Collingwood procured Coast’s agreement to cancel the contracts, and on May 10, 1982, Coast purported to reconvey the grain back to Collingwood.
The bankruptcy court awarded Collingwood payment for car 77602; Coast does not challenge this award. The bankruptcy court also found that Collingwood had received payment for car 77487. Collingwood does not argue otherwise. Thus neither car is involved in this appeal. Collingwood does challenge the bankruptcy and district courts’ award of the proceeds for the remaining six cars to Coast. We have jurisdiction pursuant to 28 U.S.C. sections 1291, 1471.
Collingwood argues that it is entitled to the value of the six cars of grain under U.C.C. section 2-702. It claims that its rights under U.C.C. section 2-702 are not defeated by the stockyards. In support of this contention, it notes that Coast had no right to convey any interest in the grain to the stockyards as Coast itself has never paid for the grain, never had possession of the grain, and affirmatively dishonored its payment drafts prior to delivery. Collingwood further contends that in any event it is entitled to recover the proceeds of Coast’s resale of the grain to the stockyards or should be granted an administrative priority under section 546(c) of the Bankruptcy Act, 11 U.S.C. § 546(c) (1982), for the amounts of its claims.
Alternatively, Collingwood asserts that Coast and itself have voided the sales in question, and that Coast has reeonveyed the grain to Collingwood giving Collingwood the right to the value of the grain. Collingwood also contends that the grain was delivered under contracts which were executory when Coast filed for bankruptcy. Finally, both Coast and Collingwood seek attorneys’ fees.
II.
Section 546(c) of the Bankruptcy Code, 11 U.S.C. § 546(c) (1982), allows a seller of goods, with certain restrictions, to exercise any statutory or common law right he may have to reclaim the goods from a bankrupt buyer. Whether seller has a statutory or common law right to reclaim goods is a matter of state law. See H.R.Rep. No. 595, 95th Cong., 2d Sess. 371-72 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 6327-28; Los Angeles Paper Bag Co. v. James Taleott, Inc., 604 F.2d 38, 39 (9th Cir.1979) (interpreting § 546 rights in accord with Arizona U.C.C.); In re Landy Beef Co., 30 B.R. 19, 20 (Bankr.D.Mass.1983). It is unclear which state’s law applies in this case. The contracts were entered into by the Colorado branch of an Oregon corporation (Coast) and a Kansas company (Collingwood) for performance (delivery of grain) in Arizona. As we could reach the same result under the law of any of the four states mentioned, we need not resolve a choice of law issue.
All four states have adopted the Uniform Commercial Code. See Ariz.Rev. Stat.Ann. §§ 44-2201 to 44-3153 (1967); Col.Rev.Stat. §§ 4-1-101 to 4-9-507 (1974); Kan.Stat.Ann. §§ 84-1-101 to 84-9-507 (1983); Or.Rev.Stat. §§ 71.1010 to 79.5070 (1973). U.C.C. section 2-702 allows a seller of goods on credit to reclaim goods delivered to an insolvent buyer if the seller demands reclamation within ten days of the receipt of the goods. U.C.C. § 2-702(2) (1976); see also 11 U.S.C. § 546(c)(1) (1982) (demand must be in writing to be given effect in bankruptcy). Section 2-702 is also applied to ostensible cash sales. See U.C.C. § 2-507 official comment 3 (1976); In re Samuels & Co., 526 F.2d 1238, 1244 *690 (5th Cir.) (en banc), cert. denied, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976); First National Bank of Arizona v. Carbajal, 132 Ariz. 263, 267, 645 P.2d 778, 782 (1982). By its own terms section 2-702 is the seller’s exclusive remedy, preempting other U.C.C. and common law remedies. U.C.C. § 2-702(3) (1976); see In re Deephouse Equipment Co., 22 B.R. 255, 258 (Bankr.D.Conn.1982).
A seller’s section 2-702 rights are subject to the rights of buyers in the ordinary course of business and good faith purchasers under section 2-403. Compare Ariz.Rev.Stat.Ann. § 44-2381(c) (1967) and Or.Rev.Stat. § 72.7020(3) (1973) (seller’s right to reclaim also subject to rights of lien creditors) with Col.Rev.Stat. § 4-2-702(3) (1974) and Kan.Stat.Ann. § 84-2-702(3) (1983). Section 2-403 provides that a good faith purchaser for value obtains good title from one to whom the goods have been delivered even though the initial buyer had only voidable title. In particular an initial buyer has full power to convey good title even if it subsequently fails to honor its check or it fails to make the cash payment called for. U.C.C., § 2-403(1)(b), (c) (1976).
The stockyards’ purchase of the grain precludes Collingwood from exercising any right it may have had under section 2-702 to reclaim the grain, because the stockyards are good faith purchasers for value under the U.C.C. To act in good faith under article 2 of the U.C.C., a party must exhibit honesty in fact and fair dealing. See U.C.C. § 2-103(1)(b) (1976). Collingwood bore the burden of proving the stockyards’ lack of good faith. See In re Kentucky Flush Door Corp., 28 B.R. 808, 810 (Bankr.W.D.Ky.1983) (seller has burden of proving right to reclaim). There is no evidence that the stockyards acted in a dishonest or unfair manner. For example, while one car, car 77563, arrived at its destination after Coast filed its bankruptcy petition, Collingwood was unable to show that it had informed the stockyards of Coast’s insolvency before the car’s arrival.
Collingwood argues that the intervening purchase by the stockyards cannot defeat its rights under section 2-702 because Coast had no rights in the grain to transfer to the stockyards. This argument is directly contrary to the explicit command of section 2-403. Moreover, section 2-403 is consistent with those sections of the U.C.C. limiting a defaulting buyer’s rights in goods, see U.C.C. § 2-507(2) (1976) (buyer’s right to retain and dispose of goods conditioned on making any payment due and demanded upon delivery); U.C.C. § 2-511(3) (1976) (rights of buyer defeated if check is dishonored), as the scope of those sections expressly applies only to the determination of rights as between the original parties to the sale. See Brumley Estate v. Iowa Beef Processors, Inc., 704 F.2d 1351, 1362 (5th Cir.), modified, 715 F.2d 996 (1983), cert. denied, — U.S.-, 104 S.Ct. 1288, 79 L.Ed.2d 690 (1984); Evans Products Co. v. Jorgensen, 245 Or. 362, 370, 421 P.2d 978, 982 (1966).
The Fifth Circuit, en banc, rejected similar arguments in In re Samuels & Co., 526 F.2d at 1247 (5th Cir.1976); see J. White & R. Summers, The Uniform Commercial Code § 24-9 at 1027 (2d ed. 1980). In Samuels cash sellers delivered goods to the debtor without being paid. The sellers’ rights to recover the goods under either section 2-702 or section 2-507 were held subordinate to the rights of a bank which had a security interest in the debtor’s inventory. The bank’s interest was held to have attached upon delivery and was not defeated by the bankrupt’s nonpayment. Sellers exercise their right to reclaim only when the initial buyer fails to pay for the goods. To say that such a failure to pay precludes good faith purchasers from obtaining good title would completely negate the effect of section 2-702(3) and section 2-403.
Recently, applying Arizona law, we reached the same result as Samuels in a case similar to the one here. Los Angeles Paper Bag Co. v. James Talcott, Inc., 604 F.2d 38 (9th Cir.1979). In Los Angeles Paper Bag Co. we held a secured creditor’s *691 interest to attach upon delivery of goods directly to a third party customer of the buyer despite the buyer’s default of payment. We also held such delivery directly to a third party as called for by the contract to be sufficient delivery for the rights of a good faith purchaser, a secured creditor in that instance, to attach under sections 2-403 and 2-702(3). See also Ceres, Inc. v. ACLI Metal & Ore Co., 451 F.Supp. 921, 925 (N.D.Ill.1978) (seller’s right to reclaim goods in hands of third party bailee turns on whether bailee continued to hold goods for seller or had attorned to buyer). That Coast never had physical possession of the grain is not determinative. Section 2-403 requires that the goods be delivered to the initial buyer before subsequent good faith purchasers may obtain good title from voidable title. Delivery to the stockyards, however, constituted delivery to Coast because such delivery fulfilled Collingwood’s duty to Coast under the contracts. Delivery, not possession, is the relevant factor.
Similarly, the result is not altered because Coast’s draft may have been dishonored before rather than after all delivery was complete. The dishonor of the drafts before all delivery gives Collingwood less rights, not more. The dishonor of a check prior to delivery does not terminate a contract under the U.C.C.; rather the seller has the right to require adequate assurances of performance and to suspend his performance until such assurances are forthcoming. See U.C.C. § 2-507 (1976) (unless otherwise specified, payment not due until delivery tendered); U.C.C. § 2-609 (1976) (upon reasonable grounds for insecurity, seller may suspend performance pending reasonable assurances of payment); U.C.C. § 2-612 (1976) official comment 6 (seller’s normal remedy for buyer’s breach with regard to one installment is to demand assurances under § 2-612); U.C.C. § 2-705 (1976) (seller may stop delivery of goods in transit if buyer fails to make payment or seller otherwise has right to reclaim). To allow the dishonor of checks prior to delivery to prevent good faith purchasers for value from obtaining good title after delivery would be anomalous: when the seller has delivered the goods before learning of the buyer’s default, he cannot prevent a good faith purchaser from obtaining good title; when the seller could have stopped delivery to protect his rights, his failure to do so should not preclude a good faith purchaser after delivery from obtaining good title.
In addition to being prevented from reclaiming the goods themselves, Collingwood may hot “reclaim” proceeds of the resale of the grain. Several courts have concluded that a reclaiming seller under section 2-702 may not recover the proceeds of the resale of the goods. In re Samuels & Co., 526 F.2d at 1245; In re Landy Beef Co., 30 B.R. at 20 n. 4, 21; In re Kentucky Flush Door Corp., 28 B.R. at 810; In re Deephouse Equipment Co., 22 B.R. at 258; Action Industries, Inc. v. Dixie Enterprises, Inc., 22 B.R. 855, 859-60 (Bankr.S.D.Ohio 1982); In re Flagstaff Foodservice Corp., 14 B.R. 462, 466-67 (Bankr.S.D.N.Y.1981); see J. White & R. Summers, Uniform Commercial Code § 24-9 at 1029 (2d ed. 1980). We see no reason to'depart from this precedent. Section 2-702 speaks only of reclaiming goods not of reclaiming proceeds. Section 2-702, therefore, does not in and of itself create a right to reclaim the proceeds of the resale of the goods. Collingwood has not argued, and we do not decide, the question of whether section 2-702 creates a security interest directly cognizable under article 9. See U.C.C. § 9-113 (1976); Jackson & Peters, Quest for Uncertainty: A Proposal for Flexible Resolution of Inherent Conflicts Between Article 2 and Article 9 of the Uniform Commercial Code, 87 Yale L.J. 907 (1978).
The cases relied on by Collingwood do not indicate a contrary result. Johnson v. Robinson, 203 F.2d 135 (5th Cir.1953); Greater Louisville Auto Auction v. Ogle Buick, Inc., 387 S.W.2d 17 (Ky.Ct.App.1965). Both Johnson and Greater Louisville Auto Auction held that solvent third party buyers who were not bona fide good *692 faith purchasers could not, as a matter of equity, retain the proceeds of their subsequent resale of the goods rather than return the proceeds to the original seller. No such solvent intermediary with notice of the original buyer’s insolvency is present here. Further, these cases explicitly relied on equitable principles rather than statutory or common law. Johnson, 203 F.2d at 136; Greater Louisville Auto Auction, 387 S.W.2d at 19. Section 546’s recognition of a “statutory right or common law” right of reclamation leaves no room for such equitable principles.
Finally, Collingwood would be entitled to an administrative priority to the funds owed to it only if it were entitled to reclaim the grain or its proceeds and the bankruptcy court prevents it from doing so. Section 546 of the Bankruptcy Act allows a seller to reclaim goods only to the extent he has a statutory or common law right to do so. Section 546(c)(2)(A) mandates the award of an administrative expense priority to the seller if the court denies “reclamation to a seller with such a right of reclamation.” (Emphasis added.) The right to an administrative priority is therefore in lieu of, not in addition to, any right to reclaim. In re Flagstaff Foodservice Corp., 14 B.R. at 467.
In re Western Farmers Ass’n, 6 B.R. 432 (Bankr.W.D.Wash.1980), is not to the contrary. In Western Farmers the court found that the sellers had a reclamation right subject to the interest of a secured inventory creditor and allowed an administrative priority subordinate to that of the secured creditor in lieu of reclamation of the goods. Thus, in Western Farmers the sellers had a valid, although subordinated, reclamation right recognized by the bankruptcy court. Collingwood has not demonstrated any such right to reclaim goods or proceeds; therefore, it is not eligible for an administrative priority under section 546.
III.
The subsequent attempts by Coast and Collingwood to undo the sale of the grain were without effect. Coast, as trustee, could not sell or transfer any rights it had or might acquire in the grain without notice and a hearing unless such transfers were in the ordinary course of business. 11 U.S.C. § 363(b) (1982); see also 11 U.S.C. § 549 (1982) (trustee can avoid unauthorized post-petition transfers). These post-petition acts were clearly outside of the ordinary course of business. While Coast was a merchant in grain, the purported novation and resale were not good faith, ordinary transactions but rather special arrangements with the purpose of avoiding the consequences of bankruptcy. The specific references to the pre-petition contracts at issue here confirm the extraordinary nature of these purported transactions. The grain sales were valid at the time bankruptcy was filed; the post-petition transactions to defeat those sales were ineffective.
IV.
Collingwood is entitled to the value of car 77563, however, as that car was delivered under a contract which was executory at the time Coast filed its petition for bankruptcy. Obligations under contracts which are executory at the time bankruptcy is filed are payable as an administrative expense priority when the ex-ecutory contract has been assumed properly by the bankrupt.
For the purposes of the Bankruptcy Act, an executory contract is one “under which the obligations of both the bankrupt and the other party to the contract are so far unperformed [at the time of filing] that the failure of either to complete performance would constitute a material breach excusing the performance of the other.” In re Select-A-Seat Cory., 625 F.2d 290, 292 (9th Cir.1980) (citation omitted); accord In re Cochise College Park, Inc., 703 F.2d 1339, 1348 (9th Cir.1983). As of April 7, 1982, when Coast filed its petition for bankruptcy, Collingwood had delivered all the cars called for under contract 1310 to their stockyard destinations. Accordingly, that contract was not executory at the time Coast filed for bankruptcy.
*693 By contrast, while Collingwood had shipped the cars due under contract 1397, none of those cars had arrived at its destination by the time Coast filed for bankruptcy. Coast argues Collingwood nonetheless had rendered substantial performance because Collingwood, by shipping the grain, had done all that it had to do to ensure delivery of the grain. The contract, however, required Collingwood to perform by delivery of the grain, not shipment. The risk of loss remained with Collingwood during shipment. See U.C.C. § 2-319(l)(b) (1976). If Coast had not filed for bankruptcy and the grain had not been delivered, we would not consider Collingwood to have rendered adequate performance under the contract simply by shipping the grain.
Further, while the grain was en route, Collingwood retained the right to stop the ears in transit and prevent delivery, as it did in the case of car 77602. See U.C.C. § 2-705 (1976). Where the seller stops the goods in transit the contract is executory. In re National Sugar Refining Co., 27 B.R. 565, 573-74 (S.D.N.Y.1983). The contract should be no less executory because the seller chooses not to suspend performance but tenders performance subsequent to the filing of the bankruptcy petition.
Collingwood is therefore entitled to an administrative priority for the amount due for car 77563, the one car under contract 1397 for which Collingwood has not yet been paid. The amount of the administrative expense priority Collingwood is entitled to is the same regardless of whether Coast assumes or rejects the contract, as there is no evidence that the grain was sold to Coast at anything other than its reasonable value.
V.
Finally, neither party is entitled to attorneys’ fees. There is no general right to attorneys’ fees for actions in bankruptcy. A party may, however, be entitled to attorneys’ fees in the bankruptcy proceeding in accord with the applicable state law. In re Sparkman, 703 F.2d 1097, 1099 (9th Cir.1983). Both Coast and Collingwood claim attorneys’ fees under Or.Rev.Stat. §§ 20.090, 20.096. Section 20.090 provides for the award of attorneys’ fees to the prevailing party in actions on dishonored checks; section 20.096 grants attorneys’ fees to either party which prevails on an action to enforce a contract where the contract specifically provides for attorneys’ fees to be awarded. Cf. Or.Rev.Stat. § 20.094 (1983) (attorneys’ fees to defendant debtor who prevails in action on ground of discharge in bankruptcy).
Neither statute is applicable. First, Coast’s obligation to pay the contractual debt embodied in its drafts was never in dispute. Thus, this action was outside the purview of section 20.090. Second, while both contracts provided for attorneys’ fees, this action was not one for the enforcement of the contracts. To the extent that Collingwood has sought to reclaim goods or the proceeds thereof, it has not attempted to enforce the contract but rather to rescind it. By the same token, the claim of cancellation is one of disavowal, not enforcement. Finally, the question of the applicability of the bankruptcy laws to particular contracts is not a question of the enforceability of a contract but rather involves a unique, separate area of federal law. Absent bad faith or harassment, attorneys’ fees are not available for the litigation of federal bankruptcy issues under a contract which provides for attorneys’ fees for enforcement of the contract. See In Re Fulwiler, 624 F.2d 908, 910 (9th Cir.1980) (per curiam) (attorneys’ fees not available under Or.Rev.Stat. § 20.096 in bankruptcy action to declare contractual debt nondischargable under former 11 U.S.C. § 35, now 11 U.S.C. § 523).
CONCLUSION
Collingwood is entitled to an administrative priority for the amount due for car 77563, as that car was delivered under a contract executory at the time of the filing of bankruptcy. The amounts owed for the remaining cars were properly awarded to Coast’s estate. Neither party is entitled to *694 be awarded attorneys’ fees; the parties shall bear their own costs.
The judgment of the district court is AFFIRMED IN PART and REVERSED IN PART.