**In the Matter of SAMUELS & CO., INC., Bankrupt.**

**Curtis R. STOWERS et al., Appellants,**

v.

**James S. MAHON, Trustee, and C.I.T. Corporation, Appellees.**

No. 73–1185.

United States Court of Appeals, Fifth Circuit.

March 20, 1975.

Rehearing En Banc Granted May 19, 1975.

Lamar Holley, Dallas, Tex., for appellants.

J. Richard Gowan, Dallas, Tex., for appellees.

Before AINSWORTH, GODBOLD and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

On April 15, 1974, the Supreme Court in Mahon v. Stowers, 416 U.S. 100, 94 S.Ct. 1626, 40 L.Ed.2d 79 (1974), reversed the decision of this court,[1] concluding that the Packers and Stockyards Act[2] and the regulations promulgated under the Act do not preclude the application of the Uniform Commercial Code as adopted by the State of Texas. Near the end of the opinion, the Court noted that "we do not mean to say that a course of conduct mandated by the Act or the regulations might not, just as any other course of conduct, be relevant or even dispositive under state law. . . To the extent that respondents in appealing to the Court of Appeals challenged [the district court's contrary] determination, it will of course be open for adjudication in the Court of Appeals on remand." 416 U.S. at 113–14, 94 S.Ct. at 1633. Pursuant to this order, we again review the case[3] in an attempt to define and resolve the rights of the litigants, and based on the applicable provisions of Texas law governing this commercial transaction, we conclude that the sellers are entitled to relief and reverse the judgment of the district court.

To briefly reiterate, the relevant facts are as follows. Samuels & Co., Inc., is a Texas meatpacking firm that purchases,

---

1. In the Matter of Samuels & Co., Inc. v. Mahon, 483 F.2d 557 (5th Cir. 1973). This opinion has been noted unfavorably on at least two occasions. Note, 54 Boston Univ. L.R. 469 (1974); note, 52 Tex.L.R. 570 (1974).

2. 7 U.S.C. § 181 et seq. (1970).

3. One question that arises with respect to our second review is whether we can decide the questions presented without sending the case back to the district court for evidence of custom and practice. While the record is not as fully developed as it might be, we believe that the questions can be decided without a remand. Neither the district court, this court nor the Supreme Court questioned the factual findings of the referee in bankruptcy, and he specifically found that there was an established course of conduct existing between the parties. This course of conduct, as the referee pointed out, at least conformed with, if not conducted expressly in accordance with, the federal regulations governing the transaction between the buyer and seller. Specifically, when cattle are sold on a grade and yield basis, the contract price is incapable of immediate determination. The cattle must first be slaughtered, chilled and then graded before the purchase price can be calculated. When this procedure is followed, and no one contends that it was not, then the price is determined and a check is issued to the seller. No one, neither the parties to the litigation nor the courts that have attempted to resolve the issues, contested these factual determinations made by the referee. While it is true that the evidence on which the referee relied in arriving at these conclusions is not detailed in the record, these conclusions, made in light of the regulations and in the absence of contentions to the contrary or any doubts raised throughout the appellate process, constitute a sufficient basis on which we can rely in deciding the case. Moreover, from reading the opinion of the referee, it seems that the theories on which we rely are essentially those relied on by him in his holding for the cattle farmers.

processes and packages meat and sells the meat within and without the State of Texas. Since 1963 Samuels' operations, including its cattle purchases, have been financed on a weekly basis by C.I.T. Corporation. To secure its financing, C.I.T. has properly perfected a lien on Samuels' assets, inventory and all after-acquired property, including livestock that is from time to time purchased for slaughter and processing.

From May 12 through May 23, 1969, the appellants, fifteen cattle farmers, delivered their cattle to Samuels. Although the sellers did not receive payment for the sale simultaneously with delivery of the cattle, checks were subsequently issued to the sellers. On May 23, 1969, before these checks had been paid, C.I.T., believing itself to be insecure, refused to advance any more funds to Samuels for the operation of the packing plant. On that same day Samuels filed a petition in bankruptcy. Since C.I.T. refused to advance more funds, although apparently aware that there were unpaid checks outstanding, the appellants' checks issued in payment for cattle were dishonored by the drawee bank.

Because of the fungible nature of the cattle, the beef has long since been butchered and processed and sold through the normal course of business. The proceeds from the cattle sales have been deposited with the trustee in bankruptcy pending the outcome of this litigation. The issues in this case concern the priority of interest in these proceeds between a creditor of the debtor, which holds a perfected security interest in the debtor's after-acquired property, and a seller of goods to the debtor. Since the sellers have not been paid, they claim a superior right to the deposited proceeds and argue that they are now entitled to payment out of these proceeds. The finance corporation, on the other hand, contends that the sellers are merely unsecured creditors of the bankrupt and are not entitled to a prior claim to the funds, and alternately that the finance corporation qualified as a good faith purchaser of the cattle and is therefore immune to the sellers' claims of non-payment. For the reasons that follow, we conclude that the sellers should prevail.

## I.

■ In order to determine which provisions of the Texas Business & Commerce Code govern the relationships among the parties, the first question that must be resolved is whether this commercial venture was a cash or credit transaction. The significance of classifying a sale as a cash or credit transaction relates back to the common law and the historical passing of title concept. Under the common law, a sale for cash, as opposed to a sale on credit, meant that the seller of goods implicitly reserved the incidents of ownership or title to the goods until payment was made in full. If the buyer failed to make payment, the seller could regain possession of the goods by instituting an action in replevin. Additionally, since the buyer of goods for cash did not obtain title to the goods until the seller was paid, the defaulting buyer was incapable of passing title to a third party. Based on the cash sale doctrine, an unpaid seller could even reclaim goods sold by an intermediary to one who otherwise qualified as a bona fide purchaser.

■■ When the owner of goods sold them on credit, however, all the incidents of ownership, including title, passed to the buyer. If the buyer subsequently failed to make payment, the seller's rights were only those of a creditor for the purchase price, and he had no right against the merchandise. Since in a sale on credit the buyer obtained all the incidents of ownership in the goods, including title, he was able to convey his interest in the goods, absolute ownership, to a third party without recourse on behalf of the seller. Corman, Cash Sales, Worthless Checks and the Bona Fide Purchaser, 10 Vanderbilt Law Review 55 (1956); Gilmore, The Commercial Doctrine of Good Faith Purchaser, 63 Yale L.J. 1057, 1060 & n. 10 (1954).

Underlying the different characteristics and consequences of cash and credit sales are the expectations and intentions

of the three parties concerned. When goods are sold for cash, the seller is assuming virtually no risk of loss because he believes that he has full payment for the goods in his hands. When the sale is for credit, however, the seller assumes a far more substantial risk and voluntarily relinquishes the incidents of ownership to the buyer. The buyer, possessed of these incidents of ownership, is capable of conveying title to a bona fide purchaser, completely terminating the rights of the seller in the goods. The credit seller recognizes that he will receive full payment for his merchandise only if the business of the buyer progresses normally and sales are made to third parties in the normal course of business. Note, The Owner's Intent and the Negotiability of Chattels: A Critique of Section 2–403 of the Uniform Commercial Code, 72 Yale L.J. 1205, 1220 (1963). Although commercial transactions and the law governing such relationships has developed significantly since the conception of these doctrines, this reasoning with respect to the different risks assumed by the different sellers underlie and differentiate the two concepts and is as valid a distinction today as it was when the doctrines were originally conceived.

The Uniform Commercial Code as adopted by the State of Texas has to some extent modified the common law doctrines of cash and credit sales. It is clear that the historical concept of passing title to goods is not emphasized in the Code, and the location of title generally is not regarded as being determinative of the rights of adverse parties. Helstad, Deemphasis of Title Under the Uniform Commercial Code, 1964, Wisconsin L.R. 362. Instead of implementing the fictional concept of title, the countervailing interests of the parties are sometimes defined in terms of various rights, privileges, powers and immunities.

But even though the title concept is so reduced in significance, the Code recognizes and adopts the fundamental distinctions of the common law between cash and credit sales, at least with respect to the rights of the unpaid seller against the defaulting buyer. The Code deals with a sale on credit in provisions separate from those dealing with cash sales. Section 2.702 specifically sets forth the credit seller's remedy and provides that when "the seller discovers that the buyer has received goods on credit while insolvent, he may reclaim the goods upon demand made within ten days after receipt . . .." Texas Business and Commerce Code, § 2.702(b), V.T.C.A. (1968). This provision goes on to define the seller's priority rights against other specific parties, providing that "[t]he seller's right to reclaim under Subsection (b) is subject to the rights of a buyer in the ordinary course or other good faith purchaser or lien creditor under this chapter (Section 2.403)." Id. § 2.702(c). Although this section authorizes a limited right against the goods, it generally recognizes that when the sale is on a credit basis, all the incidents of ownership pass to the buyer who may then convey this interest to certain third parties. The seller stands merely as a general creditor for the purchase price.

With respect to cash sales, however, § 2.507 of the Code explicitly recognizes that "unless otherwise agreed," "[w]here payment is due and demanded on the delivery to the buyer of goods . . ., [the buyer's] right as against the seller to retain or dispose of them is conditional upon his making payment due." Texas Business and Commerce Code, § 2.507(b) (1968). Like the cash sale doctrine at common law, § 2.507 provides that when the buyer is to pay cash for the goods, the validity of the transaction is dependent upon his making payment, and when the buyer fails to pay, he does not even have the right to possess the goods. Absolute ownership does not pass to the buyer until payment is complete.

The limited interest conveyed to the buyer prior to payment under § 2.507(b) is reemphasized in § 2.511(c), which deals specifically with the situation where payment for goods is made by check that is later dishonored. Section 2.511(c) provides that payment by

check "is conditional and is defeated as between the parties by dishonor of the check on due presentment." Texas Business and Commerce Code, § 2.511(c) (1968). Underlying this provision is the principle that, in order to encourage and facilitate commercials sales and economic growth generally, the recipient of a check in payment for goods "is not to be penalized in any way" for accepting this commercially acceptable mode of payment. *Id.* Comment 4.

■ Even though the Code deemphasizes the title concept of the common law, these two provisions strongly suggest that the underlying philosophy of the common law cash sale doctrine has been embodied here. Like the traditional cash sale doctrine, the existence of a valid contractual relationship between the buyer and seller is dependent upon the buyer's completing his part of the bargain and paying for the merchandise. When the buyer fails to pay, he no longer has even the right to possess the goods.

Mindful of these principles we turn to the facts of the instant case to determine whether the sale of the cattle to the packing house was on a cash or credit basis. This sale of goods must be regarded as a cash transaction rather than a credit transaction because of the established course of dealing between the buyer and sellers. A course of dealing, as defined by the Texas Commercial Code, is a "sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Texas Business and Commercial Code, § 1.205(a) (1968). As suggested by the Supreme Court in *Stowers, supra,* the Packers and Stockyards Act and the regulations issued thereunder so outline the course of conduct to be followed as between the cattle seller and the purchasing meat packer.

According to the Act and regulations, when a cattle grower sells his livestock on what is termed a "grade and yield" basis, the contract price to be paid is left open because it has yet to be determined. Before the purchase price can be determined, the cattle must be slaughtered and the carcasses chilled for twenty-four hours. After the meat is chilled, the Department of Agriculture grades it and determines the yield, and at that time the contract price can be set. When the price is set, a point sometime after delivery, a check is issued to the seller. 9 CFR §§ 201.43(b),—.99.

■ While a lapse of time occurring between delivery of the cattle and payment, even if only a day, might be considered an extension of credit, the course of dealing between the parties establishes that this was a sale for cash. The delay between delivery and payment was not credit, but rather was the result of a procedure mandated by the Act and regulations that governed the relationship between the buyer and seller when cattle are sold on a grade and yield basis. This procedure apparently had been followed since the inception of the regulations requiring such conduct. Moreover, not only do the Act and regulations prescribe such a course of conduct, all the cattle sellers regarded this commercial venture as a cash transaction, and there is nothing in the record to suggest that the buyer regarded the delay in issuing the check as credit. The course of conduct prescribed by the Act and regulations, coupled with the undisputed intent of the cattle sellers, compels the conclusion that this was a cash and not a credit affair. Engstrom v. Wiley, 191 F.2d 684 (9th Cir., 1951); In re Helms Veneer Corp., 287 F.Supp. 840 (W.D.Va., 1968).

Having so concluded, we turn to §§ 2.507 and 2.511 in order to define the cash seller's rights and remedies. Although § 2.702, dealing solely with credit sales, specifically outlines the seller's right to reclaim the property and sets forth priorities as to certain third parties, neither §§ 2.507 or 2.511 explicitly define the cash seller's rights or priorities. The only indication of the seller's rights is in the comment following § 2.507, which implicitly authorizes the

seller's right to reclaim and simultaneously imposes a ten day limit on that right when the buyer is insolvent. In re Mort, 208 F.Supp. 309 (E.D.Pa., 1962); Greater Louisville Auto Auction v. Ogle Buick, Inc., 387 S.W.2d 17 (Ky.Ct.App. 1965); J. White & R. Summers, The Uniform Commercial Code, 98 (1972); Kinyon, Outline of Buyer-Seller Rights and Remedies in Default and Breach Situations Under the UCC, 53 Minn.L.R. 729, 731 (1969).

While armed with a right to reclaim the cattle, the sellers failed to comply with the ten day limitation on that right. The record shows that the sellers did not file a petition for reclamation for almost a year. The Code does not arbitrarily impose this limitation on the seller's rights, but does so in order to conform with the fundamental policies of the Code and the Bankruptcy Act. By imposing this limitation, a creditor is required to promptly disclose and identify his claim to property in the bankrupt's estate so that other creditors will not prejudice themselves. Otherwise, a creditor might extend credit to the bankrupt subsequent to its filing a petition on the basis of a misapprehension that the bankrupt possesses unencumbered assets. Additionally, when all the claims are promptly disclosed, the objective of the Bankruptcy Act, equitable distribution of the bankrupt's assets among its creditors, is more fully assured. See J. White and R. Summers, The Uniform Commercial Code 872 (1972).

Although the sellers did not reclaim the property until sometime after the filing of Samuels' petition for bankruptcy, the purposes for imposing the limitation had been fulfilled. C.I.T. in its own behalf filed a reclamation petition on or before July 23, 1969, only about two weeks after the petition in bankruptcy was filed. A hearing was held, and on August 13, 1969, the referee in bankruptcy entered an order generally outlining C.I.T.'s claims to the assets and inventory of the bankrupt. In demonstrating its claim to Samuels' assets, there apparently was extensive disclosure of Samuels' financial affairs, all of which, as noted later, C.I.T. was intimately aware. At the end of the order, the referee noted that "the asserted lien rights other than the debtor, C.I.T. Corporation and the receiver, are in no way prejudiced hereby and the court reserves for further consideration any question pertaining to conflicting claims of liens or lien priorities."

While all the claims were not particularized in the referee's order, the hearing and order disclosed many claims against the estate and demonstrated to the parties involved the great likelihood of other claims being asserted against the assets. The record does not disclose that any creditors prejudiced themselves by extending credit on what they believed to be unencumbered assets. Indeed, because C.I.T. had such an in depth knowledge of Samuels' financial affairs, it was well aware of the claims of the cattle sellers that were unpaid as a result of its refusal to advance more money. Recognizing the many conflicting claims against the estate, the referee wisely preserved the current state of affairs and specifically refrained from adjudicating any additional disputes until a later date.

Nor does the seller's ultimate reclamation of the cattle, or rather proceeds from sale of the cattle, prejudice the rights of any creditors. When a sale is made on credit, the purchased merchandise belongs to the estate of the bankrupt and all the seller has is a security interest in the property. If the seller failed to perfect his interest, he stands as a general creditor with the rest of the unsecured creditors and is entitled only to his proportionate share of the bankrupt's estate. To allow him to recover his loss in full from the estate would prejudice the rights of the other creditors. In re Colacci's of America, Inc., Bar Control of Colorado v. Gifford, 13 U.C.C.Rep. 1023 (10th Cir., 1973); Engstrom v. Wiley, *supra,* 191 F.2d at 689; Engelkes v. Farmers Co-op Co., 194 F.Supp. 319 (N.D.Iowa, 1961).

■ But when the sale is for cash, the merchandise belongs to the bankrupt's estate only if the buyer pays for the goods. If payment is not made, the seller is not a mere creditor and therefore is not compelled to share proportionately with the general creditors of the estate. The general creditors are not entitled to any portion of these assets because the goods do not belong to the bankrupt estate. The seller's reclamation of the goods does not remove any assets of the bankrupt in which general creditors would share and thus does not prejudice the rights of the seller on credit. Since the seller for cash is not a creditor and is not required to share with the general creditors in the estate as a creditor, he is entitled to his merchandise.

Also, C.I.T.'s initiation of the reclamation proceeding assisted in identifying the various creditors and thereby insured a more equitable distribution of the bankrupt's estate. When the various creditors and their claims are revealed at an early stage, all the parties involved are able to assess the current financial status of the bankrupt and the probability of obtaining some return on the credit extended to the bankrupt. Early identification of the claims, plus the referee's preserving all creditors' rights until a later time, insured an equitable distribution of the estate.

Besides the underlying purpose of the ten day rule being satisfied, the facts show that the sellers made a faithful attempt to comply with the provisions of the Code. As pointed out by appellees, due to the sellers' misapprehension of the events culminating in Samuels' bankruptcy, the sellers' reclamation petition was not filed until almost a year after the filing of Samuels' bankruptcy petition. The sellers apparently believed that after Samuels filed the petition in bankruptcy on May 23, 1969, the packing house conducted normal operations. Only shortly after Samuels was adjudicated bankrupt on May 6, 1970, did the sellers file their petition for reclamation. Apparently the sellers thought that there was no need for them to assert their rights under the Code until after the adjudication of straight bankruptcy.

To add to the confusion, it is not clear from the Code that the sellers had any remedy to seek at all. While the Code sets forth the sellers' right to reclaim, under the peculiar facts of this case assertion of that right would seem futile. As pointed out earlier, the Packers and Stockyards Act and regulations issued thereunder require that when livestock is sold on a grade and yield basis, it must be slaughtered almost immediately and the carcasses chilled so that the purchase price can be determined. Through the normal processing thereafter the carcasses are butchered and packaged and the identity of the cattle is lost. Since each owner's property could not be identified, it would seem to have been futile to assert the right to reclaim. A conclusion requiring such an exercise in futility certainly would not conform with reason. Additionally, the sellers never even had the opportunity to protect their property by reclamation because the identity of most of the cattle was destroyed when the petition in bankruptcy was filed.

■ Under these circumstances, strict application of a ten day limitation on the right to reclaim is unwarranted. The fundamental purposes of imposing the ten day limitation on the sellers' rights have been fulfilled and the sellers made an attempt to comply with the Code's terms. Reason and logic mandate that we not require a futile gesture on behalf of the sellers to reclaim their cattle when it had already lost its identity. The right to reclaim under § 2.502, we think, has been properly preserved.

## II.

Having concluded that as between the seller and buyer, the seller is entitled to prevail, we turn to the sellers' rights as against the finance corporation. Relying basically on Article 9 provisions that outline priorities between perfected and unperfected security interests, C.I.T. first argues that any attempt by the sellers to retain title to the goods merely reserves an unperfected security interest and that

this unperfected interest is subordinate to its perfected security interest covering Samuels' after-acquired property. Texas Business and Commerce Code, § 9.301(a)(1) (1968); *see* Hogan, Unperfected Security Interests and the Floating Lien, 44 Tex.L.R. 713, 714 (1966).

It is true that § 2.401(a) of the Code modifies an attempt to retain title to the retention of an unperfected security interest in the goods. And, indeed, if this interest was the only interest of the sellers, the application of Article 9 provisions would seem to cut off the sellers' rights. But closer examination of the Code provisions and the Code's underlying philosophy leads to the conclusion that these provisions do not contemplate a situation in which the sale is for cash and thus do not control the outcome of the litigation at hand.

Section 2.401(a) deals with the situation in which the seller of goods attempts to retain title to the goods, but the sale is nevertheless a credit transaction, not cash. A common example of this type of transaction is when goods are sold to a buyer, and the buyer is obligated to make periodic payments for the goods. Title to the goods, however, is not supposed to pass to the buyer until the last payment is made at the end of the term. *See* The Sherer-Gillett Co. v. Long, 318 Ill. 432, 149 N.E. 225 (1925).

But this simply is not the case when a sale is made for cash. In a cash sale the seller believes, and not unreasonably, that he has his payment in hand. The only phase of the transaction left uncompleted is the seller's cashing the check. All he has to do is put the check in the mail and wait for it to be cleared at the bank, or take the check directly to the bank and cash it. Because the limited time sequence, extending from the receipt of the check to its being cashed, is so short, it would be unreasonable to require the cash seller to follow the litany of the Code and take measures to perfect an alleged security interest. *See* Corman, Cash Sales, Worthless Checks and the Bona Fide Purchaser, 10 Vanderbilt L.R. 55, 65 (1956).

Presumably, any shifting of the loss from the purchaser to the seller that might be contemplated by the Code is based on the Code's provisions that authorize the seller to follow the prescribed steps and protect himself against loss. But because of the limited time sequence involved, the seller does not have the opportunity to protect himself. It would take more time and effort to protect his interest under the Code than to simply collect on the check. The reasons for limiting a seller's interest to an unperfected security interest simply do not exist in the cash sale transaction.[4]

Supporting the conclusion that the seller's rights are not cut off under Article 9 are the explicit provisions of

---

4. In the event that a conflict among secured interest holders arises, the Code clearly provides that generally the unperfected interest will always be subordinate to the perfected interest. The only exception to this rule is the purchase money security interest. When the transaction involves inventory, the Code gives this particular interest priority over the perfected lien if, and only if, the holder perfects its interest when the buyer takes possession of the goods and the seller gives notice to the financier. Texas Business and Commerce Code, §§ 9.312(c)(1)–(2) (1968); Hogan, Unperfected Security Interests and the Floating Lien, 44 Tex.L.R. 713, 720 (1966).

But these requirements just further demonstrate the impracticality of requiring a cash seller to take steps to perfect and protect his interest in the goods sold. Plainly the cash seller need only cash his check and his interests are totally and undeniably protected, rather than follow the often confusing and more demanding provisions of the Code. Moreover, because at least some of the sellers delivered their cattle immediately prior to Samuels filing a petition for bankruptcy, it was practically impossible for them to comply with the requirements of the Code before Samuels closed its doors and C.I.T. asserted its claims to the cattle. Because of the impracticality demonstrated by an analysis of these provisions in light of the limited element, we do not think that the Code intended to limit the cash seller's rights only to an unperfected security interest and subject the seller to the consequences of holding such an undesirable interest.

the Code. Section 9.102 and the accompanying comments broadly define the scope of Article 9, but carefully limit its application to commercial transactions in which the parties intend to create security interests. As found by the referee, and it has not been contested in this court, each of the cattle sellers involved in this litigation regarded the sale to Samuels as a cash transaction, and there is nothing in the record to suggest that any of the parties involved thought it was anything but a cash sale. Selling goods on a credit basis involved the assumption of a far greater risk on the part of the seller than when the goods are sold for cash. To summarily label these sellers as holders of unperfected security interests would change entirely the nature of the transaction as it was intended by the parties, and alter the cash seller's status to one who thinks he has full payment for his goods to one in which he stands as a mere unsecured creditor. The Code was designed to supplement the agreement between the parties in commercial transactions where the parties failed to provide, not completely change the character of an existing relationship. See Bunn, Freedom of Contract Under the Uniform Commercial Code, 2 B.C.Ind. & Com.L.R. 59 (1960); J. White and R. Summers, The Uniform Commercial Code 6 (1972).

■ Even assuming the validity of C.I.T.'s argument that the sellers have only an unperfected security interest that is subordinate to their perfected interest, the finance corporation is still not entitled to prevail over the sellers. In order for C.I.T. to have a valid security interest in the cattle, three fundamental requirements must be met. First, the debtor and creditor must enter into an agreement and that agreement must be reduced to writing. The record is clear that C.I.T. had been financing Samuels' operations at least since 1963 and had a security interest in Samuels' assets and inventory. Second, the creditor must give value. The Code makes clear that an antecedent debt will constitute value. Third, the debtor must acquire rights in

the collateral to which the lien can attach. It is with respect to the third element making up an enforceable security interest that gives rise to the difficulty in the case at hand.

■ Less than absolute ownership of goods has been deemed by the courts to be sufficient rights in property to which a lien on after-acquired property can attach. Although the location of title to the goods generally does not determine the rights of the parties, the Code provides that the title to goods follows their possession. Consequently if the presence of title made any difference, which it does not, title would seem to be in the debtor Samuels. In addition to possession of the cattle, Samuels had other rights incident to mere possession such as the right to begin slaughtering the cattle and processing and packaging the meat.

■ But even assuming that the debtor had sufficient rights in the collateral to which C.I.T.'s lien attached, C.I.T.'s rights in the collateral, like the rights of the debtor, were only conditional. Since the Code provides that the rights of the creditor stem from the debtor's obtaining rights in the collateral, it seems that the creditor's rights are derived from, and are no greater than, the rights of the debtor. J. White and R. Summers, The Uniform Commercial Code 795 (1968). When the debtor's rights in the collateral are only conditional, the rights of the creditor are also so limited. The only source of rights upon which Samuels could rely to claim any rights in the goods, including mere possession, was the contract of purchase between itself and the sellers. When Samuels failed to fulfill its part of the bargain by not paying, this contractual relationship came to an end, and thus Samuels had absolutely no right to retain or dispose of the merchandise. Since under Texas law the debtor had only a defeasible interest in the property that was terminated when it failed to pay, the lienholder's right, derived solely from the rights of the debtor, also terminated.

This is not to say that a security interest cannot continue to exist with respect to collateral in the event that the debtor sells, exchanges or otherwise disposes of the goods. Texas Business and Commerce Code, § 9.306(b) (1968). This extension of a secured party's rights in goods contemplates a sale or disposition to a fourth party. It does not anticipate a termination of the right of a debtor in goods with respect to the source from which the debtor procured the goods.

This general approach to the provisions of the Code was set forth in In re Mort, 208 F.Supp. 309 (E.D.Pa., 1962), and the reasoning of that case, although subject to some disagreement, has been reaffirmed by courts and commentators alike. In re Helms Veneer Corp., *supra;* In re Lindenbaum's, Inc., 2 U.C.C.Rep. 495 (E.D.Pa., 1964); Greater Louisville Auto Auction v. Ogle Buick, Inc., *supra;* Countryman, Buyers and Sellers of Goods in Bankruptcy, 1 N.M.L.R. 435, 447, n. 63 (1971); *see* International Harvester Credit Corp. v. America Nat'l Bank, 296 So.2d 32 (Fla., 1974); Braucher, Reclamation of Goods from a Fraudulent Buyer, 65 Mich.L.R. 1281 (1967). *But see,* In re Hayward Woolen Co., 3 U.C.C.Rep. 1107 (Referee in Bankruptcy 1967); Guy Martin Buick v. Colorado Springs Nat'l Bank, 32 Colo.App. 235, 511 P.2d 912 (1973); Evans Products Co. v. Jorgensen, 245 Or. 362, 421 P.2d 978 (1966). In *Mort* the petitioner sought reclamation of goods that he delivered to the bankrupt two days before bankruptcy. The bankrupt had issued a check in payment for the goods, but because of the intervening bankruptcy, the check was dishonored. The court found that the sale was for cash and, relying on §§ 2–507(2) and 2–511, concluded that the unpaid seller of the goods had the right to reclaim them. Even without regard to whether the lienholder's rights had attached to the property, the court held that the seller's right to reclaim was superior to the rights of any creditor, including the rights of the trustee in bankruptcy. Likewise, the unpaid seller's rights to reclaim in the instant case are superior to the unattached lien of C.I.T.

### III.

The third question is whether C.I.T. qualifies as a good faith purchaser. Under § 2.403 of the Code, the buyer of goods from a seller is vested with a limited interest that it can convey to a good faith purchaser and thus create in the purchaser a greater right to the goods than the buyer itself had. This is possible even when the buyer obtains the goods as a result of giving a check that is later dishonored or when the purchase was made for cash. But in order to attain this status, the proponent must be a *purchaser* that gives *value* and acts in *good faith.* While C.I.T. gave value for the goods within the meaning of the Code, it failed to meet the test of a purchaser or one acting in good faith.

With regard to C.I.T.'s status as a purchaser, the Code broadly defines this term as one who take "by sale, discount, negotiation, mortgage, pledge, lien, issue or reissue, gift or any other voluntary transaction creating an interest in property." Texas Business and Commerce Code, § 1.201(32) (1968); *see id.* § 1.201(33). As noted earlier, C.I.T. does not have an interest in the cattle because its rights in the collateral are derivative of its debtor's rights in it. When Samuels failed to pay for the cattle, its rights in the cattle terminated and thus so did C.I.T.'s. C.I.T.'s status as a good faith purchaser is also defeated with regard to its acting in good faith. The Code defines good faith as "honesty in fact in the conduct or transaction concerned." Texas Business and Commerce Code, § 1.201(19) (1968). Implicit in the term "good faith" is the requirement that C.I.T. take its interest in the cattle without notice of the outstanding claims of others. *See* Greater Louisville Auto Auction v. Ogle Buick, Inc., *supra,* 387 S.W.2d at 21. *See also* Fidelity and Casualty Co. v. Key Biscayne Bank, 501 F.2d 1322, 1326 (5th Cir. 1974).

It is true that the evidence does not reveal any breach of an express obligation on C.I.T.'s behalf to continue financing the packing house after Samuels filed a petition in bankruptcy. Nor does the good faith element require the creditor to continue to finance the operation of a business when it is apparent that the business is unprofitable and is going bankrupt. But because of the integral relationship between C.I.T. and Samuels, we do not see how C.I.T. could have kept from knowing of the outstanding claims of others. C.I.T. maintained close scrutiny over the financial affairs of Samuels' operations. C.I.T. had been financing Samuels' packing house operations for at least six years, and the financing involved the flow of millions of dollars. The amount of cash advances made to Samuels was not predetermined or determined arbitrarily, but was calculated only after C.I.T. examined weekly the outstanding accounts and the current inventory of the business. From such a continuous and prolonged study of the business to determine the amount of each weekly advance, C.I.T. must have been intricately aware of the operations and financial status of the business.

▮ Since C.I.T. was so intimately involved in Samuels' financial affairs, it must have known that when it refused to advance additional funds, unpaid checks issued to cattle sellers by Samuels would be dishonored. Samuels' operations were totally dependent on the financing of C.I.T. and both parties knew it. From its enduring involvement in the weekly financing, C.I.T. apparently knew that Samuels was purchasing and processing cattle up until the very time of filing the petition. Knowing that cattle had been purchased and processed immediately preceding its refusal to advance more money, C.I.T. must have known as a result of this refusal that some cattle sellers who had recently delivered their cattle to Samuels would not be paid. Because C.I.T. and Samuels were so intertwined in the management of the financial affairs of the business, we do not think that C.I.T. can plausibly claim, in complete honesty, that it was

unaware of the claims of the unpaid cattle sellers. Since C.I.T. was aware of these outstanding claims, it does not qualify as a good faith purchaser.

## IV.

▮ We now turn to the unpaid cattle sellers' rights as against the trustee in bankruptcy. It is true that under § 70c of the Bankruptcy Act the trustee, as a hypothetical lien creditor, will cut off the rights of the sellers as holders of unperfected security interests. But as pointed out earlier, the sellers' rights are not limited merely to the retention of an unperfected security interest, for they also have the right to reclaim the cattle. Thus the question becomes whether the trustee's lien gives him a priority of interest in the proceeds of sale of the cattle as against the sellers' rights to reclaim.

Turning again to § 2.507 of the Code in order to define the sellers' rights, we see that the section and accompanying comments implicitly give the sellers the right to reclaim, but it expressly subordinates that right only to a good faith purchaser. There is no mention of a subordination of the reclamation rights to the trustee in bankruptcy, nor is there any suggestion in this provision, the following comments, or otherwise that the drafters of the Code intended that the sellers' right to reclaim be so subordinated. Indeed, in view of the historical developments leading to the drafting and subsequent amendment of § 2.705, an analogous provision which deals solely with credit sales and not cash, irresistible logic compels the conclusion that the Code draftsmen intended for the sellers' reclamation rights to prevail over the trustee's lien.

When § 2.705 was originally written, it spelled out that a seller's right to reclaim was subordinate to "a buyer in ordinary course or other good faith purchaser or lien creditor . . . ." Texas Business and Commerce Code, § 2.702(c) (1968). Construing this provision, the Third Circuit in In re Kravitz, 278 F.2d 820 (1960), held that a trustee

in bankruptcy fell within the definition of lien creditor. Since the Code did not set out the priorities of a lien creditor as against the seller's right to reclaim, the court turned to Pennsylvania law and concluded that under the law of that state, the lien creditor should prevail. Consequently the sellers' attempts to reclaim their property were unsuccessful.

*Kravitz* and its implications have been widely discussed. Peters, Remedies for Breach of Contracts Relating to the Sale of Goods under the Uniform Commercial Code: A Road Map for Article 2, 73 Yale L.J. 199, 219, n. 64 (1963). Although the permanent editorial board in 1962 rejected a proposed amendment to § 2.702 based on the *Kravitz* decision that would have deleted the words "lien creditor," the board in 1966 adopted the amendment and deleted this party as one to which reclamation rights would be subordinated. J. White and R. Summers, The Uniform Commercial Code, 243 (1972). This amendment, obviously thoroughly considered, amply demonstrates that the provisions of the Code were not intended to subordinate the sellers' reclamation rights to those of the trustee in bankruptcy.

But even assuming the continuing vitality of *Kravitz*, that decision does not control the outcome of this litigation. The litigants in *Kravitz* dealt on the basis of a credit transaction and thus § 2.703, dealing solely with credit transactions, defined the rights of the sellers as against the trustee in bankruptcy. Under the facts of the instant case, however, we are concerned with a cash sale, and thus the sellers' rights are defined by § 2.507. Nowhere in that provision, the accompanying comments, or the law of Texas, is the sellers' rights to reclaim subordinated to a lien creditor or a trustee in bankruptcy. The sellers' right to reclaim having been properly preserved, the cattle farmers are entitled to exercise it now.

## V.

We believe it inequitable to deny the claims of the stock farmers who produced and delivered the cattle, in favor of the mortgagee who refused to advance the money before bankruptcy. We adhere to the teachings of Bank of Marin v. England, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966):

> " * * * There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction. Section 2a, 52 Stat. 842, 11 U.S.C. § 11(a); Pepper v. Litton, 308 U.S. 295, 304–305 [60 S.Ct. 238, 84 L.Ed. 281]; Securities & Exchange Commission v. United States Realty & Imp. Co., 310 U.S. 434, 455 [60 S.Ct. 1044, 84 L.Ed. 1293.] We have said enough to indicate why it would be inequitable to hold liable a drawee who pays checks of the bankrupt duly drawn but presented after bankruptcy, where no actual revocation of its authority has been made and it has no notice or knowledge of the bankruptcy. The force of §§ 70d(5) and 18f can be maintained by imposing liability on the payee of the checks if he has received a voidable preference or other voidable transfer. The payee is a creditor of the bankrupt, and to make him reimburse the trustee is only to deprive him of preferential treatment and to restore him to the category of a general creditor. To permit the trustee under these circumstances to obtain recovery only against the party that benefited from the transaction is to do equity."

It is our firm belief that the approach to the Code outlined above is eminently reasonable and conforms with the Code's express provisions and underlying policies. We do not believe that the drafters of the Code intended for the unpaid sellers to walk away from this transaction with nothing, neither their goods nor the purchase price, while the mortgagee enjoys a preferred lien on that for which it refused to advance payment. Based on our understanding of the Code, such a result is insupportable.

We again reverse the judgment of the district court.

**154**

GODBOLD, Circuit Judge (dissenting):

I dissent.

This case raises one primary question: under the Uniform Commercial Code as adopted in Texas, is the interest of an unpaid cash seller in goods already delivered to a buyer superior or subordinate to the interest of a holder of a perfected security interest in those same goods? In my opinion, under Article Nine,[1] the perfected security interest is unquestionably superior to the interest of the seller. Moreover, the perfected lender is protected from the seller's claims by two independent and theoretically distinct Article Two provisions. My result is not the product of revealed truth, but rather of a meticulous and dispassionate reading of Articles Two and Nine and an understanding that the Code is an integrated statute whose Articles and Sections overlap and flow into one another in an effort to encourage specific types of commercial behavior. The Code's overall plan, which typically favors good faith purchasers,[2] and which encourages notice filing of nonpossessory security interests in personalty through the imposition of stringent penalties for nonfiling, compels a finding that the perfected secured party here should prevail.

My brothers have not concealed that their orientation in the case before us is to somehow reach a result in favor of the sellers of cattle, assumed by them to be "little fellows," and against a large corporate lender, because it seems the "fair" thing to do. We do not sit as federal chancellors confecting ways to escape the state law of commercial transactions when that law produces a result not to our tastes. Doing what seems fair is heady stuff. But the next seller may be a tremendous corporate conglomerate engaged in the cattle feeding business, and the next lender a small town Texas bank. Today's heady draught may give the majority a euphoric feeling, but it can produce tomorrow's hangover.

## I. Rights under § 2.403

My analysis begins with an examination of the relative rights of seller and secured party under § 2.403(a).

Section 2.403 gives certain transferors power to pass greater title than they can themselves claim. Section 2.403(a) gives good faith purchasers of even fraudulent buyers-transferors greater rights than the defrauded seller can assert. This harsh rule is designed to promote the greatest range of freedom possible to commercial vendors and purchasers.

The provision anticipates a situation where (1) a cash seller has delivered goods to a buyer who has paid by a check which is subsequently dishonored, § 2.403(a)(2), (3), and where (2) the defaulting buyer transfers title to a Code-defined "good faith purchaser." The interest of the good faith purchaser is protected *pro tanto* against the claims of the aggrieved seller. §§ 2.403(a); 2.403, Comment 1. The Code expressly recognizes the power of the defaulting buyer to transfer good title to such a purchaser even though the transfer is wrongful as against the seller. The buyer is granted the *power* to transfer good title despite the fact that under § 2.507 he lacks the *right* to do so.

The Code definition of "purchaser" is broad, and includes not only one taking by sale but also covers persons taking by gift or by voluntary mortgage, pledge or lien. § 1.201(32), (33). It is therefore broad enough to include an Article Nine secured party. §§ 1.201(37); 9.101, Comment; 9.102(a), (b). Thus, if C.I.T. holds a valid Article Nine security interest, it is by virtue of that status *also* a purchaser under § 2.403(a). *See* First Citizens Bank and Trust Co. v. Academic Archives, Inc., 10 N.C.App. 619, 179 S.E.2d 850 (1971); Stumbo v. Paul B. Hult Lumber Co., 251 Or. 20, 444 P.2d 564 (1968); In re Hayward Woolen Co., 3 U.C.C. Rep. 1107 (D.Mass., 1967).

While I shall discuss in detail *infra*, the implications of C.I.T.'s security interest under Article Nine and under other

---

1. Ch. 9, Tex.Bus. & C.Code. All citations and references to the U.C.C. are to the Code as adopted in Texas.

2. See, e. g., §§ 2.403; 3.302, 3.305; 6.110; 7.501, 7.502; 8.301, 8.302; 9.307; 9.309.

Article Two provisions, I here note that C.I.T. is the holder of a perfected Article Nine interest which extends to the goods claimed by the seller Stowers.

Attachment of an Article Nine interest takes place when (1) there is agreement that the interest attach to the collateral; (2) the secured party has given value; and (3) the debtor has rights in the collateral sufficient to permit attachment. § 9.204(a).

(1) *The agreement:* In 1963, Samuels initially authorized C.I.T.'s lien in its after-acquired inventory. The agreement between these parties remained in effect throughout the period of delivery of Stowers' cattle to Samuels.

(2) *Value:* At the time of Stowers' delivery, Samuels' indebtedness to C.I.T. exceeded $1.8 million. This pre-existing indebtedness to the lender constituted "value" under the Code. § 1.201(44).

(3) *Rights in the collateral:* Finally, upon delivery, Samuels acquired rights in the cattle sufficient to allow attachment of C.I.T.'s lien. The fact that the holder of a voluntary lien—including an Article Nine interest—is a "purchaser" under the Code is of great significance to a proper understanding and resolution of this case under Article Two and Article Nine. The Code establishes that purchasers can take from a defaulting cash buyer, § 2.403(a). Lien creditors are included in the definition of purchasers, § 1.201(32), (33). A lien *is* an Article Nine interest, §§ 9.101, Comment; 9.102(b); 9.102, Comment. The existence of an Article Nine interest presupposes the debtor's having rights in the collateral sufficient to permit attachment, § 9.204(a). Therefore, since a defaulting cash buyer has the power to transfer a security interest to a lien creditor, including an Article Nine secured party, the buyer's rights in the property, however marginal, must be sufficient to allow attachment of a lien. And this is true even if, *arguendo,* I were to agree that the cash seller is granted reclamation rights under Article Two. *See* First National Bank of Elkhart Cty. v. Smoker, 11 U.C.C. Rept.Serv. 10, 19 (Ind.

Ct.App., 1972); Evans Products Co. v. Jorgensen, 245 Or. 362, 421 P.2d 978 (1966).

If the Article Nine secured party acted in good faith, it is prior under § 2.403(a) to an aggrieved seller. Under the facts before us, I think that C.I.T. acted in good faith. The Code good faith provision requires "honesty in fact", § 1.201(19), which, for Article Two purposes, is "expressly defined as . . . reasonable commercial standards of fair dealing." §§ 1.201, Comment 19; 2.103(a)(2). There is no evidence that C.I.T. acted in bad faith in its dealings with Samuels, or that Stowers' loss resulted from any breach of obligation by C.I.T. There is no claim that the 1963 security agreement was the product of bad faith. The lender's interest had been perfected and was of record for six years when Stowers' delivery to Samuels occurred. There is no suggestion that the $1.8 million debt owing from Samuels to C.I.T. was the result of bad faith or of a desire to defeat Stowers' $50,000 claim. There is no claim that C.I.T. exercised or was able to exercise control over Samuels' business operations. There is no evidence that C.I.T. authorized or ordered or suggested that Samuels dishonor Stowers' check. There is no contention that C.I.T.'s refusal to extend credit on May 23, the date Samuels filed a voluntary petition on bankruptcy at a time when it owed C.I.T. more than $1.8 million, was violative of an obligatory future advance clause. The Code's good faith provision requires "honesty in fact", § 1.201(19); it hardly requires a secured party to continue financing a doomed business enterprise.

The majority deny that C.I.T. acted in good faith because, they claim, the lender had "intimate" knowledge of Samuels' business operations. The majority's source of information on the scope of C.I.T.'s knowledge is a little puzzling. The Referee in Bankruptcy found only that "C.I.T. knew or should have known of the manner by which the bankrupt bought livestock . . . on a grade and yield basis." In the Matter of Samuels & Co., Inc., No. BK 3–1314 (N.D.

Tex. order of Jan. 19, 1972). This factual finding was affirmed by the District Court which reversed the Referee and upheld C.I.T.'s priority over Stowers. *Id.*, orders of Nov. 24, 1972, and Jan. 16, 1973. Neither the Referee nor the District Court found, nor have the parties alleged, that C.I.T.'s knowledge of Samuels' business extended to knowledge of the debtor's obligations to third party creditors.

However, even if evidence had established that C.I.T. knew of Samuels' nonpayment and of Stowers' claim, C.I.T.'s status as an Article Two good faith purchaser would be unaffected. Lack of knowledge of outstanding claims is necessary to the common law BFP, and is similarly expressly required in many Code BFP and priority provisions. *See e. g.*, §§ 3.302; 6.110; 8.301, 8.302; 9.301(a)(2). But the Code's definition of an Article Two good faith purchaser does not expressly or impliedly include lack of knowledge of third-party claims as an element. The detailed definition of the Article's counterpart of the common law BFP requires only honesty in fact, reasonable commercial behavior, fair dealing. And this describes precisely C.I.T.'s dealings with Samuels: during the period May 13–22—the time when the bulk of Stowers' cattle were delivered and the time of the issuance of the NSF checks—C.I.T.'s advances to Samuels totalled $1 million. The advances were curtailed on May 23 because of Samuels' taking voluntary bankruptcy at a time when its indebtedness to C.I.T. was enormous. The decision to terminate further funding was clearly reasonable. It was also fair, and honest, and, as the majority have failed to grasp, was not the cause of Stowers' suffering. As I note *infra* in my analysis of rights under Article Nine, the sellers' loss was avoidable through perfection of their security interests in the cattle. If they had perfected, they would not only have been prior to C.I.T. as an Article Nine lender, § 9.312, but also protected against C.I.T. as an Article Two purchaser, § 9.201. As it happens, Stowers did not perfect. I believe the sellers cannot now be permitted to force an innocent, if prosperous, secured creditor to shoulder their loss for them.

## II. Rights under § 2.507

The majority opinion devotes much of its concentration and energy to an analysis of the sellers' "reclamation right" under § 2.507 and § 2.702. Relying on an expansive reading of these Sections, the opinion concludes that a cash seller whose right to payment is frustrated through a check ultimately dishonored can "reclaim" proceeds of goods delivered to the buyer despite an interim third-party interest, and despite a yearlong delay in seeking reclamation. I am unable to accept this reading of Code policy and requirements.

Although the Code expressly grants a credit seller the right and power to reclaim goods from a breaching buyer, the right is triggered only by specific and limited circumstances; it can be asserted only if an exacting procedure is followed; and the right can never be asserted to defeat the interests of certain third parties who have dealt with the defaulting buyer. § 2.702(b), (c). There is no Code Section expressly granting a similar reclamation right to a cash seller.

The seller's remedies upon breach are enumerated in § 2.703. These provisions do not include or suggest a right or power in a cash seller to recover goods already delivered to a breaching buyer. Nevertheless the courts have read a reclamation right into the Code. It is this judicially-confected right to reclaim goods in which the majority's reclamation analysis is grounded. However, the majority take the reclamation right beyond anything intimated by the Code or heretofore permitted by courts recognizing a cash seller's reclamation right.

The cash seller's right to reclaim has been drawn from the language of § 2.507(b) and § 2.507, Comment 3. I note, first, that the remedy granted by § 2.507(b) is one of seller against buyer, *see* In re Helms Veneer Corp., 287 F.Supp. 840 (W.D.Va., 1968). It does not concern rights of seller against third par-

ties. Section 2.507, Comment 3 explains that the seller's rights under § 2.507 must "conform with the policy set forth in the bona fide purchase section of this Article," i. e., with § 2.403. As I have noted above, under this provision the rights of an aggrieved cash seller are subordinated to those of the buyer's good-faith purchasers, including Article Nine lenders such as C.I.T. Thus, the Code provisions supporting a cash seller's reclamation right expressly preclude recovery by Stowers as against C.I.T. See §§ 2.507(b); 2.507, Comment 3; 2.702(b), (c). See also Stumbo v. Paul B. Hult Lumber Co., 251 Or. 20, 444 P.2d 564 (1968); In re Hayward Woolen Co., 3 U.C.C.Rep. 1107 (D.Mass., 1967); Evans Products Co. v. Jorgensen, 245 Or. 362, 421 P.2d 978 (1966).

Moreover, those courts which have permitted reclamation under § 2.507 have invariably adhered to § 2.507, Comment 3's express requirement that demand for return be made within ten days after receipt by the buyer or else be lost. See In re Colacci's of America, Inc., 490 F.2d 1118 (CA 10, 1974); In re Helms Veneer Corp., supra; Stumbo v. Paul B. Hult Lumber Co., supra; In re Mort, 208 F.Supp. 309 (E.D.Pa., 1962).

In the instant case, demand was not made within ten days or ten weeks; it came a full year after delivery to Samuels. The majority excuse this gross noncompliance by finding that the sellers' failure was the product of innocent error, and, in any event, was not required since the "purpose" of the demand rule—protection of purchasers of the delivered goods—was served through C.I.T.'s alleged intimate knowledge of Samuels' business operations.

The Code's ten-day provision is an absolute requirement. There is no exception in the Code Sections or Comments, express or implied, to the statutory period. I would be hesitant to read any extension into a statute of limitations clear and unambiguous on its face, and particularly unwilling to allow an extension some 36 times greater than the statutory maximum. My reluctance is all the greater where the right at issue is not granted by the Code but is rather the product of judicial interpretation of a Comment which, whatever grant of power it may suggest, expressly limits that right to a ten-day life.

The spirit in which the rule was broken seems to me irrelevant. Even conceding that Stowers' noncompliance occurred in absolute good faith, it was nonetheless noncompliance. Mistake of law does not constitute excuse of mistake.

C.I.T.'s apocryphal intimate knowledge of Samuels' business operations is, I believe, also irrelevant to a determination of the validity of Stowers' claim. The majority find the purpose of the ten-day rule to be one of notice to third parties that a claim exists. I have somewhat greater difficulty than my brothers in pinpointing the purpose of the ten-day rule. But I am convinced that the goal is not one of protection or notice to third-party purchasers, for their rights are secure under the Code as against the aggrieved seller even if demand is timely made. §§ 2.507, Comment 3; 2.702(c). The Code does not condition the purchasers' rights on a lack of knowledge of the seller's interest. With or without knowledge, the purchaser rests secure. I am therefore forced to conclude that the ten-day rule serves some function other than notifying third-party takers, and, consequently, that even if C.I.T. knew of Stowers' claim, the sellers' obligation under the ten-day rule would not have been excused. And even if knowledge by the purchaser suspended the sellers' duty to make a timely demand, the record in this case is devoid of any hint that C.I.T. knew of Samuels' breach and Stowers' reclamation right.

Moreover, § 2.507 and § 2.702 speak of a right to reclaim goods. Neither provision grants a right to go after proceeds of those goods. Where a right or interest in proceeds is recognized by the Code it is recognized expressly. See e. g., § 9.306. The right granted by § 2.507 is narrowly defined. I am unwilling to imply an extension to such a short-lived and precisely drawn remedy.

Finally, even if there were a right to reclaim proceeds, even if the right had been timely exercised, and even if it could have been exercised despite the transfer of interest to C.I.T., Stowers would have taken subject to C.I.T.'s perfected Article Nine interest. See §§ 9.201, 9.301, 9.306, 9.312. See also my discussion of C.I.T.'s rights and interest under Article Nine, infra.

### III. Rights under § 2.511

The majority opinion states that C.I.T.'s interest cannot be found superior to Stowers' because such a finding would violate § 2.511's prohibition on penalizing a seller for accepting as payment a check which is ultimately dishonored. I believe the majority have misconstrued the scope and significance of § 2.511.

Like § 2.507, § 2.511 concerns claims of the seller as against the buyer. See § 2.511(c), § 2.511, Comment 4. On its face it does not affect the rights of third parties taking from the defaulting buyer. Moreover, and more important, the seller is not here "penalized" for taking an N.S.F. check. Such loss as Stowers suffered is the direct result of his failure to comply with Code provisions which, once followed—and regardless of Stowers' acceptance of Samuels' check— would have made his interest invulnerable to claims by C.I.T. See, e. g., §§ 9.107; 9.201; 9.301; 9.312(c), (d).

### IV. Rights under Article Nine

I am also unable to agree with the majority's conclusion that, under the Code, Stowers' interest is different from and greater than a security interest. Similarly, I disagree with the theory that by virtue of Stowers' power under Article Two, C.I.T.'s security interest is subject to defeat since it (1) could not attach because the debtor's rights in the collateral were too slight to permit attachment and (2) was subject to defeat even if it attached because a security interest collapses if the debtor's right to the property is extinguished. The majority's result is achieved only by ignoring or circumventing the plain meaning of Article Nine and Article Two.

Prior to the enactment of the Uniform Commercial Code, seller and buyer could agree that, despite buyer's possession, title to goods sold was to remain in the seller until he was paid. Such a reservation of title under the "cash sale" doctrine would defeat not only a claim to the goods by the defaulting buyer, but also the claims of lien creditors of the buyer, for the buyer's naked possession could give rise to no interest to which a lien could attach.

However, the U.C.C. specifically limits the seller's ability to reserve title once he has voluntarily surrendered possession to the buyer: "Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest." § 2.401(a). See also § 1.201(37). The drafters noted the theory behind this provision: "Article [Two] deals with the issues between seller and buyer in terms of step by step performance or non-performance under the contract for sale and not in terms of whether or not 'title' to the goods has passed." § 2.401, Comment 1.

The majority opinion interprets § 2.401(a) as applying only to "credit" sales, and of no effect where the parties have contracted a "cash" sale. However, the Code provision speaks of "any reservation of title." It does not on its face apply solely to credit sales. There is no authority under the Code for the majority's restrictive interpretation. Numerous courts have, in fact, applied § 2.401 to cash sales. See e. g., Guy Martin Buick, Inc., v. Colo. Springs Nat'l Bank, 32 Colo.App. 235, 511 P.2d 912 (1973); First Nat'l Bank of Elkhart Cty. v. Smoker, 11 U.C.C.Rep. 10 (Ind.App., 1972); English v. Ralph Williams Ford, 17 Cal.App.3d 1038, 95 Cal.Rptr. 501 (1971); Evans Products v. Jorgensen, 245 Or. 362, 421 P.2d 978 (1966). I have been unable to find even one case suggesting that § 2.401 applies only to credit sales.

If the majority were correct, the Section would be merely definitional, for a credit sale is but a sales transaction in which the seller reserves a security interest. However, § 2.401 is not definitional.

It is operational and concerns the effect of transfer of possession under a sales contract upon any reservation of title. Neither law nor logic leads me to believe that § 2.401 is correctly interpreted to exclude cash sales.

The majority also suggest that Stowers' interest cannot be characterized as a security interest subject to Article Nine requirements and priorities since, the majority conclude, such interests must be "consensual". While it is true that many interests governed by Article Nine are consensual, §§ 9.102; 9.102, Comment, the Code clearly subjects Article Two security interests arising not by consent but by operation of law to Article Nine. *See* §§ 2.401(a); 9.113; 9.113, Comment 2. *See also* §§ 2.326; 9.114; 9.102, Comment 1.

Since Stowers' interest upon delivery of the cattle to Samuels was limited to a security interest subject to Article Nine, §§ 2.401(a); 9.113, the validity of C.I.T.'s Article Nine interest becomes crucial. If C.I.T. is the holder of a perfected Article Nine interest in the collateral claimed by Stowers through its unperfected § 2.401 interest, C.I.T.'s interest will prevail over Stowers', § 9.312(e).

The majority assert that C.I.T. cannot claim an interest in the cattle because Samuels' interest was too slight to permit attachment. *See* § 9.204(a). As I noted in my discussion of rights under § 2.403, this argument ignores the significance of § 2.403(a) and § 1.201(32), (33). The Code anticipates a situation where the interest of an unpaid cash seller who has delivered goods to a breaching buyer is subordinated to the interest of "purchasers" of the buyer. Lien creditors are included in the definition of "purchasers"; in order that there *be* lien creditors, the buyer's interest must be great enough to allow attachment. Therefore, however Samuels' interest upon delivery of the cattle is defined, and however slight or tenuous or marginal it was, it was necessarily great enough to permit attachment of a lien, including C.I.T.'s Article Nine interest.

The majority find that even if attachment occurred, C.I.T.'s interest would be defeated by Stowers' reclamation. The theory behind this argument is that the rights of the Article Nine secured party are at best coextensive with the rights of the debtor; if the debtor loses his rights, the security interest too is lost.

Upon nonpayment Samuels lost the right to retain or dispose of the property, but the Code recognizes that the breaching buyer had the power to encumber, despite nonpayment, so long as he retained possession. §§ 2.403(a); 1.201(32), (33). In the instant case, this power arose as a result of Stowers' delivery, and it did not terminate while the goods remained in Samuels' hands. The whole point of Article Nine is the continuity of perfected security interests *once they have properly attached,* despite subsequent loss of control or possession of the collateral by the debtor. § 9.201. Article Nine does not except an unpaid cash seller from this overall plan. In fact it specifically provides a means for him to perfect and become prior to previous perfected security interests. § 9.312(c), (d).

To hold that a reclaiming seller is given the power to sweep away a security interest which was able to attach only as a direct and Code-approved result of his voluntary act of delivery to the buyer would require ignoring the meaning and interplay of Article Two and Article Nine. Article Two recognizes the continuous vitality and priority of an Article Nine interest over the rights of an aggrieved seller. *See* §§ 2.403(a); 2.507, Comment 3; 2.702(c). It would be error to believe that a proper analysis of Article Nine could require the extinction of an identical Article Nine interest in the very circumstances specified by Article Two as triggering the priority of lienor over seller. *See* §§ 2.403(a); 2.507(b); 2.507, Comment 3; 2.702(b), (c); 9.102; 9.107(1); 9.312(c), (d).

Any seeming unfairness to Stowers resulting from the Code's operation is illusory, for the sellers could have protected their interests, even as against C.I.T.'s prior perfected interest, if they had merely complied with the U.C.C.'s purchase-money provisions. §§ 9.107,

9.312(c), (d). The Code favors purchase-money financing, and encourages it by granting to a seller of goods the power to defeat prior liens. The seller at most need only (1) file a financing statement and (2) notify the prior secured party of its interest before delivery of the new inventory. The procedure is not unduly complex or cumbersome. But whether cumbersome or not, a lender who chooses to ignore its provisions takes a calculated risk that a loss will result.

In the instant case Stowers did not utilize § 9.312's purchase-money provision. The sellers never perfected. Thus, in a competition with a perfected secured party they are subordinated, and, in this case, lose the whole of their interests. *See* §§ 9.201, 9.301, 9.312(e).

V. Rights under the Bankruptcy Act

C.I.T.'s perfected security interest is not subject to defeat by the Trustee in Bankruptcy Mahon. If, however, C.I.T. were to have abandoned its claim against Samuels, Stowers would nonetheless have lost in a priority contest with the Trustee.

Bankruptcy Act § 70c confers the status of a hypothetical lien creditor upon the Trustee. Mahon could assert those § 70 rights against Stowers, an unperfected secured party, and would prevail under U.C.C. § 9.301(a)(2), (c).

Bank of Marin v. England, 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966), does not strengthen Stowers' claim. In that case the drawer of a check took bankruptcy after the check had been issued but before presentment. The drawee paid on the instrument without notice or knowledge of the bankruptcy. Such payment was in compliance with U.C.C. §§ 4.303, 4.401 and 4.402. The Supreme Court found that an application of Bankruptcy Act § 70d under these circumstances would work a hardship on the payee or drawee. *Bank of Marin* has been critically attacked by scholars, *see e. g.,* 4A Collier on Bankruptcy, § 70.68 at 755 (14th Ed. 1971). In any event, the "inequity" in *Bank of Marin* occurred when a loss resulted from the effect of a federal statute upon good faith compliance with state statute. The federal statute's operation and effect were wholly beyond the control of the innocent drawee. In the instant case Stowers' loss resulted from his own failure to comply with state law which would have enabled him to perfect his purchase money security interest. The loss could have been avoided through his own efforts. This is not the kind of loss equity protects against.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, RONEY and GEE, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc.

It is ordered that the cause shall be reheard by the Court en banc on briefs without oral argument. The Clerk shall set a briefing schedule for the filing of supplemental briefs.